JAMES M. SPROUSE

*v.*

CLAY COMMUNICATION, INC.

(No. 13463)

Decided February 4, 1975.

*Jackson, Kelly, Holt & O'Farrell, F. Paul Chambers, Robert K. Kelly and Charles Q. Gage, T. E. Myles* for appellant.

*Gilbert S. Bachmann, Arthur B. Hanson and W. Frank Stickle, Jr.,* amicus curiae for American Newspaper Publishers Assoc.

*Rudolph L. DiTrapano, DiTrapano, Mitchell, Lawson & Field, Abbot & Jesser, W. Robert Abbot and Fred A. Jesser, III* for appellee.

*Stanley E. Preiser, Robert T. Goldenberg* amicus curiae for W. Va. Trial Lawyers.

NEELY, JUSTICE:

In the fall of 1968 James M. Sprouse was a practicing attorney in Charleston, West Virginia, and the Democratic Party candidate for Governor of the State of West Virginia. Approximately two weeks before the November election the *Charleston Daily Mail* published a series of articles implying that James M. Sprouse had engaged in real estate transactions in Pendleton County, West Virginia, of such a nature as to cast aspersions upon Sprouse's integrity. The articles implied that enormous profits would inure to Sprouse's benefit as a result of "inside" information which Sprouse acquired through his Democratic Party affiliation concerning plans of the United States Government to establish a national park at Seneca Rocks in Pendleton County. A complete text of the articles in question in reproduced in the appendix to this opinion and it is suggested that the articles be read in their entirety at this point in order fully to understand the application of the intricate law of libel to the facts of this case.

The plaintiff, James M. Sprouse, recovered a jury award in the Circuit Court of Fayette County for $250,000 actual damages and $500,000 punitive damages against Clay Communications, Inc., owner of the *Charleston Daily Mail,* a newspaper of general circulation in numerous West Virginia counties. The defendant, Clay, strenuously argued that under *New York Times Co. v. Sullivan,* 376 U.S. 254 (1964) and its progeny, the defendant is not liabel for the statements made about Sprouse even though they were false because Sprouse did not prove actual malice, as that term is judicially defined in the law of libel by *New York Times.*

This appeal presents a question of first impression in the United States with regard to the law of libel in light of *New York Times v. Sullivan, supra.* The basic issue concerns whether evidence indicating that a newspaper foreswore its role as an impartial reporter of facts and joined with political partisans in an overall plan or scheme to discredit the character of a political candidate is relevant in determining whether the newspaper acted in reckless and willful disregard of the truth when it published grossly exaggerated, defamatory headlines which were unsupported by the factual recitations in the body of the story. This Court holds that once an overall plan or scheme to injure has been established, an unreasonable deviation between headlines and the remainder of the presentation is in and of itself evidence of actual malice, which, along with other evidence, supports a jury verdict for libel.

In addition to defendant's First Amendment defenses including an allegation that the damages are excessive, defendant also assigns myriad procedural errors among which the Court considers three to be fairly raised. The first assignment of error raises the question of whether venue was properly laid in Fayette County; the second assignment presents the question of whether a previous action begun in Kanawha County alleging the same set of facts and dismissed under Rule 12(b)(6) *W. Va. RCP* was an effective bar to the present action in Fayette

County; and, the third assignment of error concerns the failure of the trial court to give two jury instructions.[1] This Court finds that there was no reversible error committed, and further finds that although the $750,000 damage award is excessive, the plaintiff proved libel in this case. Accordingly, the judgment is reversed in part and affirmed in part and the case is remanded to the Circuit Court of Fayette County with instructions to enter judgment for $250,000 actual damages plus interest and costs and to strike as a matter of law the award of $500,000 punitive damages.

## I

Under the mandate of *New York Times v. Sullivan*, *supra*, it is incumbent upon an appellate court in determining the validity of a libel judgment both to consider the law and to make an independent evaluation of the evidence to insure First Amendment protection to publishers. A candidate for political office is governed by the same stringent rules with regard to recovery as a public official. *Monitor Patriot Co. v. Roy*, 401 U.S. 265

---

[1] The Court has considered in detail the following additional assignments of error raised by petitioner, namely, that the trial court erred: (1) in overruling petitioner's objection to plaintiff's use and display before the jury throughout the course of trial of "placards" or "blowups" of the publications in question; (2) in denying petitioner's motion for a mistrial made at the conclusion of the opening statement of counsel for plaintiff on the ground of improper remarks by counsel; (3) in permitting the admission of certain tangible and testimonial evidence; (4) in permitting counsel for plaintiff to question witness Robert Mellace as a hostile witness; (5) in giving and reading to the jury plaintiff's instructions numbers 1, 2A, 3, 5, 7 as amended, 8B, 10, and 10A; (6) in refusing petitioner's instructions numbers 1, 2, 6, 10, 15, 16, 18, 20, 21, 22, 23, and 24 and part of 3; (7) in refusing to submit special interrogatory "A" to the jury; (8) in permitting plaintiff's counsel to exhibit to the jury during closing argument special interrogatory "B"; (9) in denying petitioner's motion for a mistrial made at conclusion of closing statement by counsel for plaintiff on the ground of improper remarks by counsel. Upon consideration the Court is of the opinion and does find that the assignments are without sufficient merit to be considered fairly raised, and accordingly the above assignments are summarily dismissed.

(1970). In order for a political candidate to recover for libel against a newspaper it is necessary that the candidate prove actual malice, i.e., prove either that the newspaper published false or misleading defamatory statements knowing that they were false or misleading, or that the newspaper published such statements with a reckless and willful disregard for their truth. *Monitor Patriot Co. v. Roy,* supra.

In the law of libel the word "malice" has an entirely different connotation from its general meaning in other areas of tort law. *Cantrell v. Forest City Publishing,* 95 S. Ct. 465 (1974). In libel actions "malice" does not connote the mere dislike of one party for another or the intent of one party to injure another. It is acknowledged, for example, that a political campaign necessarily involves intent on the part of one political group to "injure" opposition candidates by depriving them of elective office. In libel law "malice" has a much narrower definition and requires not only a deliberate intent to injure, but also an intent to injure through the publication of false or misleading defamatory statements known by the publisher or its agents to be false, or an intent to injure through publication of such defamatory statements with reckless and willful disregard for their truth.

Consequently, in order for the evidence in this case to withstand appellate review it is necessary that the plaintiff, Sprouse, demonstrate that the defendant *Daily Mail* knew that the defamatory material contained in the articles it printed was false or for plaintiff to demonstrate that the *Daily Mail* was reckless and willful in its indifference to the truth of the printed material. In this regard the case *sub judice* is unique in the annals of reported libel cases because it primarily involves the deliberate use of misleading words in oversized headlines rather than outright false statements. For example, the use of the headline words "land grab," "dummy firm," "bonanza," "disclosed," and "cleanup" are not libel *per se* and are all susceptible to varying interpretations. Obviously, the discovery of a five dollar bill on the

sidewalk by a vagabond is a "bonanza," while a similar discovery on the part of a senior executive is not a "bonanza." However, there is one headline over a story quoting plaintiff's opponent, Arch A. Moore, Jr., "Dummy Firm Seen Proving Corruption," which is probably libel *per se.*

The defendant argues that most of the material published was true in that: (1) Sprouse was the president of a New York corporation; (2) the corporation was engaged in land dealings in Pendleton County; (3) the corporation was making profits; and (4) the owner of Seneca Rocks was offered a small sum for his property. Consequently the plaintiff's cause of action must be grounded not in the basic substance of the articles but rather in the dramatic and misleading defamatory characterization of mundane facts, primarily in headlines, which would lead the ordinary reasonable mind to a false conclusion.

The evidence strongly supports a jury inference that the defendant knew the conclusions to be drawn from the headlines were false and further that the defendant anticipated that these false conclusions would logically follow from its presentation. The Court's decision in this case, therefore, concerns two separate questions regarding the headlines. First, the question must be resolved concerning whether the headlines taken alone can be considered defamatory without regard to mitigating material in the body of the story, and second, the question must be resolved concerning whether the mere existence of misleading headlines unsupported by the body of the story is evidence of intent to injure through publication of false, defamatory statements known at the time of publication to be false.

The evidence in this case presents a problem which might be better analyzed with reference to a hypothetical situation. Let us suppose that a public figure, John Doe, frequently participated as a leader for a Boy Scout troop and as a coach in a Little League baseball program. If those facts are beyond dispute, is it neverthe-

less libel for a newspaper to describe Mr. Doe's participation in those programs under a headline "Doe's Association with Young Boys Seen as Suspect"? The law appears to be that the truth of the facts presented under the headline would not be a defense to libel, because the obvious intent of the headline is to convey a suspicion of homosexuality which is defamatory and an unreasonable inference from the observed facts. Although such a headline is not libel *per se* it would have the same effect as the simple statement "Doe is a homosexual" which would be libel *per se*. In the simple hypothetical case, which is in all respects parallel to the case *sub judice*, the existence of such a headline unsupported by facts leading to an inference of homosexuality is evidence which may be considered by a jury on the question of malice. While alone the inconsistency between the headline and story would not be sufficient to support a libel action, such inconsistency would be one valid link in the chain of proof necessary to support a claim of (1) a false statement, (2) defamatory in nature, (3) known at the time of publication to be false, and (4) published with an intent to injure. Obviously, in the absence of other evidence demonstrating a plan or scheme to injure, mere lack of reasonableness with regard to the headline being a fair summary of the story, or even gross negligence, would not sustain a cause of action by a candidate for office. *Gertz v. Welch*, 418 U.S. 323 (1974).

In the case at bar the evidence disclosed that approximately two weeks before the publications in question, William Loy, then campaign manager for Arch A. Moore, Jr., Sprouse's election opponent, and Norman Yost, media manager for the Moore campaign, visited the office of the *Charleston Daily Mail* with information that Sprouse had engaged in land transactions in Pendleton County, West Virginia, through a corporation known as Selmet Properties, Inc. Loy and Yost conveyed this information to Jack Maurice, Robert Mellace, and Vincent Jennings, all editors of the defendant newspaper. On October 22, 1968, accompanied by members of the Moore

campaign staff, Mellace went to the U. S. Forest Service office in Elkins, West Virginia and spoke to the senior officer in charge. While in Elkins, Mellace also spoke with the land officer who had negotiated an acquisition of 1,385 acres from Selmet Properties by Nature Conservancy, Inc., a nonprofit corporation in Washington, D. C., organized to buy land which federal agencies wish to acquire for public recreational purposes. Nature Conservancy buys the land and later sells it at cost to the agencies when such agencies acquire the necessary funds.

Mellace learned from his trip to Elkins that a corporation named Selmet Properties, Inc. was incorporated in the State of New York February 25, 1965, by Jerome Grometstein, a New York attorney. He further learned that the principal office of the corporation was in New York City, and that Selmet had purchased approximately 2,900 acres of land in Pendleton County from Henry Regnery on March 12, 1966 for $134,620. Mellace then discovered that through June 7, 1966 Selmet had sold seven parcels of land to various individuals, and had violated West Virginia law by buying and selling land before Selmet qualified to hold property and do business in West Virginia. Papers later filed in the office of the West Virginia Secretary of State on August 25, 1966, more than two years before publication, qualifying Selmet to do business in West Virginia, were signed by Sprouse as president of Selmet, and the principal West Virginia office was then listed as 700 Terminal Building, Charleston, West Virginia, where Sprouse practiced law.

Mellace went to the Pendleton County Courthouse and determined that after Selmet sold 1,385 acres to Nature Conservancy for $81,364, there appeared to remain 400 acres from the original Regnery purchase. At the time of Mellace's investigation the total income of record derived by Selmet from sales of the Regnery property was $182,796.25 or approximately $48,176.75 more than its purchase price for the land. There is no evidence in the record that Mellace did not honestly believe that there were still several hundred acres left in the original

tract, although at trial it was demonstrated that only 87.09 acres actually remained. The plaintiff was unable to negate the fact that subtraction of the out convey- ances of record from the total acreage stated in the original Regnery tract deed appeared to leave approxi- mately 400 remaining acres, and therefore Mellace's good faith belief in his calculations at the time of publi- cation was not called into question.

Consequently, in the defendant's favor there was evi- dence that the newspaper believed the following facts: (1) Selmet Properties, Inc. was incorporated in New York State; (2) the corporation had conducted several routine transactions in West Virginia before qualifying to do business in the State; (3) after qualifying to do business the corporation had sold 1,385 acres of land to Nature Conservancy, Inc. for $81,364; (4) at the time of publication the corporation had made a profit of $48,176.75 on its initial investment; (5) Sprouse was pres- ident of the corporation; and, (6) there appeared to be several hundred acres of land still remaining in the orig- inal tract.

In support of plaintiff's case, however, the defendant newspaper also knew; (1) Sprouse had never hidden his participation in the corporation;[2] (2) there was no "in-

---

[2] Testimony of plaintiff James M. Sprouse on cross-examination:
Q. Now, early in the campaign, Mr. Sprouse, I believe in March, 1968, you made a public disclosure of what you said was an itemization of your income during the years 1963 to 1966, an itemization of your assets, including real property, stocks, and some personal property, even including an automobile; is that correct?
A. I issued such a statement, sir, I don't know the date.

---

(Defense counsel then read aloud the text of a news article printed in the *Charleston Gazette*, a rival newspaper of the *Daily Mail* in Charleston, which contained an extensive list of Sprouse's assets and income, among which was included the item "interest in forest- ry acreage, Pendleton County, $10,000.")

---

Q. Now, would you not admit or agree with me on reflection, and after the event, had you disclosed to the public in that release March of 1968, that you owned a certain percentage of

side" information available to Sprouse which was not generally available; (3) the corporation had qualified to do business before engaging in any major transactions and was qualified to do business at the time of publication; (4) out-of-state firms frequently do legitimate business in West Virginia; (5) Sprouse was in no way connected with or responsible for the small offer made by the U. S. Government for the purchase of Seneca Rocks from the local owner; and, (6) the remaining land owned

---

the shares of stock of Selmet Corporation which owned a large tract of land in Pendleton County, which it had purchased at a cost of $134,000, and that the corporation owed the bank a certain sum of money, making the net value of the value of your stock, a certain figure, that you would never have had these news stories in this campaign?

A. No, sir, I don't agree with you on that. I think no matter what I had put, if I had put that same information, the Daily Mail could have done the same hatchet job based on that same information.

Q. But, you see, in this story you said you, James Sprouse, had interest in forestry acreage in Pendleton County, value of $10,000. Now, would not the ordinary person construe that to mean that you, as an individual, owned some real property which was primarily of value only for timber and that it would be in your name on the property books, either alone or with co-tenants?

A. I can't say what the ordinary person would think, Mr. Chambers. My intention was to give a fair disclosure of what I owned there, and that's what I tried to do. I think at the time it was just about the value of the investment I had.

---

Q. Where did you publicly reveal your connection with Selmet Corporation before it became public knowledge on August 24, 1968?

A. In 1968?

Q. Yes.

A. When I registered—we registered with the Secretary of State and my name was listed as an officer. I signed all of these deeds as president. That was a public record. And when I signed all of these deeds, this was a public record. When I applied for a loan at the bank and we told them what it was for, everybody that wanted to know anything about it, obviously. I was proud of being associated with it. It wasn't anything I wanted to conceal.

by Selmet Properties was at least five miles from the Seneca Rocks landmark which was pictured in the newspaper photograph under the caption "Where Governor Candidate 'Cleans up.'"[3]

On October 24 and 25, 1968, the *Charleston Daily Mail* published a series of articles with very large headlines as follows:

"PENDLETON REALTY BONANZA BY JIM SPROUSE DISCLOSED"

"Cleanup of Nearly $500,000 in View"

"Seneca Rocks Tourist Project Property Enriching Candidate Sprouse"

"Sprouse Owns Choice Land Beside $30 Million U. S. Resort"

In addition to the *Daily Mail's* own commentary with regard to the land transaction, the paper printed extensive comments from Sprouse's opponent, Arch A. Moore, Jr., casting aspersions on Sprouse's honor and integrity. The largest headline in this regard said:

"MOORE ASKS FEDERAL PROBE IN SPROUSE'S LAND GRAB"

---

[3] This conclusion with regard to the evidence is either supported in the body of the articles themselves or from testimony at trial. Testimony of Robert Mellace:

Q. Getting back ... the story says "cleans up", "WHERE GOVERNOR CANDIDATE 'CLEANS UP'", October 25th.
A. The headline.
Q. The headline over Seneca Rocks, where Sprouse cleans up.
A. That is what it says.
Q. It is over a picture of Seneca Rocks, isn't it?
A. Yes.
Q. He [Sprouse] didn't even own Seneca Rocks, did he?
A. I don't think—Mr. Harper owned the Rocks, I think.
Q. Mr. Mellace, are you telling the Court and jury that people reading "WHERE GOVERNOR CANDIDATE 'CLEANS UP'" would not think it referred to the picture?
A. The general area.
Q. The general area is 10 miles from Seneca Rocks.
A. That's the general area.

followed in smaller headlines by a statement which was libel *per se:*

" 'Dummy Firm' Seen Proving Corruption"

In the October 25th edition of the *Mail* there appeared a composite picture of Seneca Rocks with the large headline:

"WHERE GOVERNOR CANDIDATE
'CLEANS UP' "

below which appeared a picture of an obviously worthy looking country gentleman and a story headlined "Fortune To Jim Sprouse But Pittance For Seneca" implying that the gentleman in the picture was suffering financially as a result of improprieties on the part of candidate Sprouse.

There is no evidence in the record offered by the defendant that any member of the *Daily Mail* staff had reason to believe that Sprouse was actually engaged in a fraudulent transaction.[4] Although to persons un-

---

[4] Testimony of Mr. Jack Maurice, one of the editors of defendant newspaper, who reviewed the articles prior to publication:

Q. Now, Mr. Mellace [sic]—Mr. Maurice, you agree, do you not, and you concluded after investigation, that there was no advance or inside information that Judge Sprouse was the beneficiary of in connection with the land purchase and subsequent sales in the Pendleton land area?

A. We concluded that we had nothing to suggest that he had any advance information.

Q. And you had nothing to suggest that that transaction, the purchase and sale of real estate in Pendleton County was in any way tainted with illegality or criminality of any kind; that's true, isn't it?

A. That is true, sir.

Q. You don't contend that?

A. No, sir.

Testimony of Mr. Robert Mellace, editor of defendant newspaper and author of the articles complained of:

Q. As I understand it, Mr. Mellace, you don't contend that Judge Sprouse had inside, advance information on this property, do you?

A. No, sir, I don't contend that.

Q. You don't contend, do you, Mr. Mellace, that way back in February, 1965, when this corporation was formed by Mr.

trained in business, the existence of an out-of-state corporation might appear to be a "dummy firm," the jury were entitled to infer from all the evidence presented that the staff of the *Daily Mail* deliberately characterized a legitimate corporation by the pejorative term "dummy firm" to conjure up the image of a conduit for illegal money when the defendant knew for an absolute certainty that the business was routine and legitimate.

The parties have cited numerous cases concerning whether headlines should be considered as an integral part of the news story, *De Husson v. Hearst Corporation*, 204 F.2d 234 (7th Cir. 1953), *Afro-American Publishing Co. v. Jaffe*, 366 F.2d 649 (D.C.Cir. 1966), or may be considered separately on the issue of whether the statements in question are defamatory. *Empire Printing Co. v. Roden*, 247 F.2d 8 (9th Cir. 1957), *Las Vegas Sun v. Franklin*, 329 P.2d 867 (Nev. 1958). The Court is of the opinion that no clear-cut rule has been established in this regard for headlines which are not libel *per se* and, therefore, each case must be considered on its facts. Generally where the headline is of normal size and does not lead to a conclusion totally unsupported in the body of the story, both headlines and story should be considered together for their total impression. However, where oversized headlines are published which reasonably lead the average reader to an entirely different conclusion than the facts recited in the body of the story, and where the plaintiff can demonstrate that it was the intent of the publisher to use such misleading headlines to create a false impression on the normal reader, the headlines may be considered separately with regard to whether a known falsehood was published. As the court said in *Afro-American Publishing Co. v. Jaffe, supra*, at

Sprouse and a [former] classmate at Columbia [University Law School], that it was done for the purpose of buying real estate to sell to the U. S. Government? Do you contend that?

A. No, sir.

Q. Let me ask you something, Mr. Mellace: Do you contend now that this corporation was formed or connected with any Act of Congress passed in March, 1965?

A. No, sir.

p. 655 "[w]hat counts is not the painstaking parsing of a scholar in his study, but how the newspaper article is viewed through the eyes of a reader of average interest."

It is important that this entire case be viewed against a background of events which occurred in West Virginia during the late 1960's when rather widespread corruption was exposed in State government. This corruption ultimately led to federal prison terms for numerous high-ranking officials, including a former Governor and a former Attorney General of West Virginia. Therefore, the public was particularly sensitive to allegations of political graft. The record sustains the jury inference that it was the intent of the editors of the defendant newspaper to take advantage of the climate of the times with regard to public sensitivity concerning graft to further the ends of their own candidate, Arch A. Moore, Jr. by impugning the integrity of the plaintiff, Sprouse.[5]

---

[5] Testimony of Robert Mellace, editor of defendant newspaper and author of the news stories complained of:

Q. Did you come about it [the story of the land transactions] originally by way of investigation?

A. No, I did not.

Q. As a matter of fact, did it not come from William Loy and Norman Yost, who at that time were directors and managers of the Republican campaign who came to your office and gave you information they wanted to have published? That is true, isn't it?

A. They did come to my office. What their titles were, I don't know. I know both of them were working for Arch Moore, and today continue to work for the Governor. I think Yost was his publicity man and Mr. Loy was his campaign director. Mr. Yost has a newspaper background and Mr. Loy, a lawyer, worked in Washington with the Governor when he was a congressman. That is true, they did come to me, yes, sir.

Regarding the state-wide circulation of the stories about Sprouse to other newspapers, Mr. Mellace testified as follows:

Q. Mr. Mellace, when you published this first story, rather after this story was written and before it was published, did you have occasion to show it to Mr. Yost?

A. I showed Mr. Yost a carbon copy of it.

Q. That was before it was published?

A. It was before it appeared in the Daily Mail, like, well, an hour and a half.

The Supreme Court of the United States has given very little guidance with regard to a situation of this type. Reported U. S. Supreme Court cases almost exclusively concern newspapers operating as independent, news-gathering agencies. The purpose of First Amendment protection for newspapers as interpreted by the

Q. And he was one of the [Moore] campaign aides who planted the story with your newspaper?

A. He was one of those who suggested there might be a story, yes, sir.

Q. And you gave it to him so he could get circulation by sending it to other newspapers, didn't you?

A. Well, yes. He asked us if it would be all right if he called other newspapers. We told him it would be all right if it was a paper that would not appear before the Daily Mail. After it appeared in the Daily Mail, we didn't care who used it.

Q. You don't normally and routinely do that, give Mr. Yost the story Daily Mail writes for publication in other papers, do you?

A. This was not a routine story.

Q. I am talking about routine practice, you don't routinely give Mr. Yost your publications to have him disseminate them?

A. This is the only time that has ever happened.

Testimony of Mr. Norman Yost, publicity director in the campaign of Arch A. Moore, Jr., the plaintiff's opponent in the gubernatorial election, and one of the men who took information to the defendant newspaper for publication:

Q. Mr. Yost, when did you first come about the information that Judge Sprouse owned an interest in real estate in Pendleton County?

A. The first information came about eight weeks, possibly ten weeks before the election in the form of rumor or of somebody reporting this information.

Q. ... After you received this information, did you have occasion to go to any newspaper and seek its publication?

A. This information, basically, was provided by Mr. Loy. And when Mr. Loy had secured certain documents that he felt were vital to the campaign, I did go to the Charleston Daily Mail.

Q. Now, Mr. Yost, how many times did you personally visit and speak with the editor or associate editor, or any officials of the Daily Mail about publication of this story?

A. This particular story?

Q. Yes.

U. S. Supreme Court is to engender wide-open, robust, and uninhibited political discussion. *New York Times v. Sullivan, supra.* Therefore, the Court holds that it is relevant to this case that the *Daily Mail* did not publish the stories in question exclusively as a news-gathering agency.

The cases of *Curtis Publishing Company v. Butts,* and its companion case, *Associated Press v. Walker,* 388 U.S. 130 (1967) stand for the proposition that when a newspaper departs from an attempt to report the news objectively, the fact of such departure can be considered by the jury and an appellate court in determining whether there was willful disregard of truth. In *Walker* the Associated Press received incorrect information from a correspondent who was present at the scene of events and who gave every indication of being trustworthy and competent. The Court reversed a judgment in favor of General Walker and held that a public figure may recover damages for defamatory falsehood only on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily followed by responsible publishers.

---

A. I had one conference in which Mr. Loy, Mr. Jennings, Mr. Maurice, Mr. Mellace was present, and I believe that was the only time I was there for this purpose or any connection therewith.

Q. And when you received the story, what did you do with that story?
A. ... I immediately called my staff together and asked them to help me distribute this story throughout the State.

Q. Could you tell us what newspapers, and I see you didn't bring notes with you, but as best your memory can serve you, can you tell us what newspapers carried this story that you and your staff circulated?
A. ... I didn't have a clip sheet at this time of the newspapers that did, but I assume that we hit every afternoon newspaper. That would be our purposes.
Q. And I take it, as an experienced news man, you knew what newspapers to call to give the story to?
A. Yes, because a news story, it is something that has to be delivered fresh. And if it is not fresh, it is not news.

Therefore, the Supreme Court held that the Associated Press was not liable for publishing an isolated defamatory dispatch concerning General Walker when it was operating under acceptable standards of good journalism. The issue in *Walker*, therefore, can be distinguished from the issue presented in the case at bar in that in *Walker* there was no evidence of participation by Associated Press in a plan or scheme to injure Walker.

The facts in the case at bar are far closer to the facts of *Curtis Publishing* where recovery was sustained by the Supreme Court partially because of the publisher's personal motives for printing the libel. In *Curtis*, a case involving a defamatory story about a football coach which appeared in *The Saturday Evening Post*, the Supreme Court sustained recovery by the plaintiff because the *Post* had deviated from generally accepted standards of responsible reporting in order to print a sensational story. Although it was not demonstrated that the *Post* knew the statements were false, the evidence disclosed that the *Post* had published highly defamatory statements upon very unreliable evidence. As Mr. Justice Warren characterized the facts in his concurring opinion:

> "Apparently because of declining advertising revenues, an editorial decision was made to 'change the image' of the Saturday Evening Post with the hope that circulation and advertising revenues would thereby be increased. The starting point for this change of image was an announcement that the magazine would embark upon a program of 'sophisticated muckraking,' designed to 'provoke people, and make them mad.' "

This Court recognizes that recent cases would appear to withdraw from the standard of 'highly unreasonable conduct' enunciated by *Curtis*. Dicta in the recent opinion in *Gertz v. Welch, supra,* indicates that mere deviation from accepted standards of journalism alone will not support an action for libel brought by a public fig-

ure. Nevertheless when *Walker* and *Curtis* are read together they still stand for the proposition that personal motives on the part of a newspaper, or participation by a newspaper in a plan or scheme to injure, is evidence of recklessness and willful disregard for truth which may be considered along with other evidence on the question of actual malice.

The information gathered by the *Daily Mail* reporters contained no facts indicating that Sprouse had engaged in anything other than a normal business transaction and there was no evidence discovered by the defendant at the time of publication of inside information as a result of political affiliation. In summary, the testimony at trial contained no evidence that the reporters of the *Mail* at the time of publication believed there existed any impropriety whatsoever.[6]

---

[6] Testimony of Mr. Marvin N. Marshall, who at the time the articles were printed was Land Staff Officer of the Monongahela National Forest, and who was one of the federal officials to whom Mr. Mellace spoke during his investigatory trip to Elkins:

Q. Did Mr. Mellace make any statements, or did he ask any questions of you or of Mr. Olliver, in your presence, regarding the transaction which is the subject of this lawsuit?

A. Yes, sir.

Q. What were those questions?

A. The questions concerned the amount of acreage in the transaction, the amount of land that was left in the ownership of Selmet Corporation, and values of the land.

---

Q. Do you know how many acres that tract consisted of? That is, in the residual?

A. 87.09.

---

Q. Was there any discussion, either statements made or questions asked by Mr. Mellace on that occasion regarding the acreage still belonging to Selmet?

A. Yes, sir.

Q. What were those, or what was that?

A. Mr. Mellace indicated there was larger acreage than that residual, and I attempted to show him from our records that there was less acreage than that, than that he indicated.

Q. Did you tell him what acreage was left?

A. I told him, in my opinion, it was less than 100 acres.

The conceptual difficulty in this case arises from the ability of different people to draw varying inferences from observation of the same set of facts. For example, it is possible for one person to observe a man running from a bank and conclude that he is involved in a bank robbery and for another person to observe the same act

---

Q. Did he indicate to you ... how many acres he thought was left?

A. Approximately 400 acres.

Q. Now did you, sir, have a discussion with him as to the value per acre, or otherwise, of the residual tract?

A. Yes, sir.

Q. What was that discussion?

A. He indicated the values were around $1,000 an acre, and I indicated that, in my opinion, having seen land sell in that area, that it would be nearer $500 per acre.

---

Q. Now, insofar as Mr. Mellace in his story, Mr. Olliver [sic], I don't find any place he quotes you, but insofar as it quotes Mr. Olliver, or attributes statements to the Forest Service, is this story basically accurate?

A. Not in my opinion.

Testimony of Mr. Robert Mellace:

Q. As a matter of fact, this company, even though it did qualify after it began to sell properties, was licensed to do business in the Office of the Secretary of State in the State of West Virginia; you had that information didn't you?

A. Yes.

Q. Bill Loy gave that to you?

A. Either that or I acquired it myself. ...

Q. As far as the records of the Secretary of State are concerned, nothing Judge Sprouse did concealed his identity or connection with that Selmet Company, did it?

A. Not to my knowledge, no, sir.

---

Q. Insofar as your word "disclosed," there was nothing to suggest that Judge Sprouse in qualifying that company did anything to submerge his identity in any fashion or character, was there?

A. I completely accept responsibility, Rudy, for these headlines, but I did not write them.

---

Q. Mr. Mellace, absent any available knowledge and absent any inside information, do you admit that this was a legitimate real estate transaction ...?

A. It was basically legitimate as far as I know, and I never said otherwise.

and conclude that the man is late for an appointment. Much discussion in politics and government concerns different conclusions derived from observation of the same random facts. Accordingly, great latitude must be given a newspaper to report observed facts and to make legitimate, negligent, or even grossly negligent inferences from those facts. Had the *Charleston Daily Mail* confined itself to reporting the facts of the Pendleton County land transactions in temperate terms, and, had it stated that further investigation might prove this transaction suspect, the *Mail* would have been protected under the First Amendment. *Monitor Patriot Company v. Roy, supra.* Defendant would even have been protected from liability for negligent misleading headlines, but not from intentional misleading headlines.

Obviously, as the U. S. Supreme Court frequently notes, there is great tension between (1) government by free discussion as assured by the First Amendment, and (2) the protection of individuals from libel. Historically since *New York Times* the clearest legal principle emerging from a reading of libel cases is that each case must be considered by an appellate court on its facts with a strong sympathy toward protection of the robust political discussion comtemplated by the First Amendment. At some point, however, cumulative evidence will show that the line of protection is breached, and a jury must be permitted to find malice, unless we are to adopt the position, articulated by Mr. Justice Black and Mr. Justice Douglas, that proper application of the First Amendment provides an absolute defense for the press to all defamation actions.[7]

In the case at bar the defendant crossed the line. The evidence supports a jury inference that the *Mail* went beyond drawing conclusions from observed facts and

[7] *See: New York times v. Sullivan,* 376 U.S. 254 (1964), Black concurring, at p. 293; *Garrison v. Louisiana,* 379 U.S. 64 (1964), Black concurring, at p. 79, and Douglas concurring, at p. 80; *Rosenblatt v. Baer,* 383 U.S. 75 (1966), Douglas concurring, at p. 88, and Black concurring and dissenting, at p. 94; *Curtis Publishing Co. v. Butts,* 388 U.S. 130 (1967), Black concurring and dissenting, at p. 170.

knowingly used the pretext of a legitimate business transaction to lead the electorate to what it again *knew* to be a false conclusion. Use of headline words such as "bonanza," "disclosed," and "cleanup," demonstrate an intent on the part of the newspaper to capitalize on the well known habit of newspaper readers of reading only the headlines. The defendant demonstrated that the headlines were written by news staff other than the authors of the stories, but *Cantrell v. Forest City Publishing, supra,* holds that once an overall scheme of recklessness has been demonstrated, *respondeat superior* applies in libel as well as other areas of tort law and the publisher is liable for the acts of employees. The defendant did not demonstrate that Mellace was ignorant of the content of the headlines before they were published, and the jury were entitled to infer that even if Mellace were ignorant of misleading headlines before publication on the 24th, those headlines were effective notice of the problem of irresponsible headlines which recurred in the publication of similar misleading headlines on the 25th.

The story in the October 25th edition of the *Mail* in which there appeared a picture of a worthy country gentleman, Mr. D. C. Harper, with the headline "Fortune to Jim Sprouse Pittance for Seneca" and the sub-headline "Landmark's Owners Plan Court Fight Against Deal," supported a jury conclusion that there was a deliberate effort to imply that the profit to Sprouse was acquired at the expense of an honest farmer, rather than in a wholly independent transaction. The *Mail* was unable to demonstrate that either Mellace or any other member of its staff had reason to believe at the time of publication that Mr. Harper in any way suffered as a direct result of Selmet's dealings with Nature Conservancy, Inc. Therefore, the plaintiff proved that this story was false or misleading, and that it was published with knowledge that it was false or misleading.[8]

---

[8] Testimony of Mr. Robert Mellace:

Q. Now, I am asking you sir, isn't it true that D. C. Harper did not plan any court fight against any deal that this has reference to?

This Court is concerned that our decision in this case may ultimately result in self-censorship by newspapers. Particularly in West Virginia, where a large portion of the State is served by newspapers which lack substantial financial assets, the threat of potential libel actions becomes repressive, not only because of possible judgments but also because of the inordinate legal expenses normally incurred in defending a protracted libel suit. Therefore it should be emphasized that the Court sustains the jury's finding of libel in this case because the plaintiff proved that the newspaper abdicated its traditional role of fairly reporting the news and became a participant in a scheme or plan, the object of which was to employ grossly exaggerated and patently untrue assertions, embodied primarily in headlines, to destroy the character of Sprouse.[9] It appears from the evidence that

---

A. Not to my knowledge.

Q. As a matter of fact, Mr. Mellace, that story or that headline was printed, 'Landmark's Owners Plan Court Fight Against Deal,' so that the common interpretation would be that he was planning a court fight against Judge Sprouse, wasn't it?

A. Well, my interpretation of that was that he was planning a fight agianst the U. S. Forest Service for not giving him enough for his land. I never connected Mr. Harper with the fight against Judge Sprouse's firm.

[9] The testimony of Mr. Robert Mellace supports this conclusion.

RE: "Disclosed."

Q. Now, Mr. Mellace, the word "disclosure" is used in your news story. I speak specifically now, of the headline appearing on October 24, 1968: "Pendleton Realty Bonanza by Jim Sprouse Disclosed."

A. Yes, that is there.

---

Q. As far as the records of the Secretary of State are concerned, nothing Judge Sprouse did concealed his identity or connection with that Selmet Company, did it?

A. Not to my knowledge, no, sir.

---

Q. "Disclosure," you would agree, suggests there was something to be disclosed that the public didn't know about, isn't that true?

not only did the *Mail* work closely with the Moore campaign staff to discover the details of the land transaction, but also that it fully cooperated in disseminating the articles to other newspapers for publication through-

A. Yes, sir.

Q. Would you admit that there was no effort on behalf of James M. Sprouse to conceal or submerge his identity up until the time of the story?
A. I don't know of any.

\*\*\*\*\*\*\*\*\*\*\*
RE: "Land Grab."
Q. The story planted by the campaign, and that was the story of October 24, 1965 [sic], and he called a press conference, and you printed and published a statement he made—I am talking now about the story of October 25th, "Pendleton Land Grab." In the headlines you used the words "Land Grab"?
A. The Daily Mail did.

Q. And "land grab," Mr. Mellace, means, does it not, the seizure of real estate or seizure of land illegally or underhanded, does it not?
A. I don't know, again these are not my words.

Q. You will agree, will you not, Mr. Mellace, that this was not a land grab? Was it?
A. In the sense that Jim stole land or grabbed it?
Q. Yes.
A. No, but, again, that is not my word.

\*\*\*\*\*\*\*\*\*\*\*
RE: "Dummy Firm."
Q. You published a sub-headline "Dummy Firm Seen Proving Corruption." Your newspaper published that?
A. Yes, sir. And, again, those are Governor Moore's words.
Q. You agree, do you not, this was not a dummy firm by any definition of the word?
MR. CHAMBERS: "Objection. I think the evidence will show whether it was or not. I don't think the witness is qualified to answer that question."

THE COURT: "This objection is overruled. You can answer the question."

A. My definition of a dummy firm *or* dummy *corporation* would be one that was formed covertly to hide the identity of

out the State. Under those circumstances the difference between the fair implication of the headlines as opposed to the supporting factual recitation of the stories is evidence alone of malice, which absent evidence to the contrary, supports the jury verdict.

---

officers doing business in that corporation, but I can't make any conclusion about why this corporation was formed.

I just know in my own mind that it was formed outside the State of West Virginia and the only business it has done was in the State of West Virginia. When it first started doing business in West Virginia, it did not, as required by law, register with the West Virginia Secretary of State.

Q. Mr. Mellace, I agree with you, it registered late, but when it registered, it registered two years and one month before this property was sold to Nature Conservancy, in August 1966, and the property was sold in October, 1968.

A. Okay.

---

Q. After it registered with the State of West Virginia it did not violate laws in the State of West Virginia did it?

A. Not to my knowledge.

\*\*\*\*\*\*\*\*\*\*\*

RE: "COURT FIGHT."

Q. Now, Mr. Mellace, if I might direct your attention to another story on October 25th. We have here the introductory headline, "Landmark's Owners Plan Court Fight Against Deal."

A. That is what it says.

Q. Now, I am asking you, sir, isn't it true that D. C. Harper did not plan any court fight against any deal that this has reference to?

A. Not to my knowledge.

Q. As a matter of fact, Mr. Mellace, that story or that headline was printed, "Landmark's Owners Plan Court Fight Against Deal." So that the common interpretation would be that he was planning a court fight against Judge Sprouse, wasn't it?

A. Well, my interpretation of that was that he was planning a fight against the U. S. Forest Service for not giving him enough for his land. I never connected Mr. Harper with the fight against Judge Sprouse's firm.

\*\*\*\*\*\*\*\*\*\*\*

Testimony of Mr. Wilson Smith, real estate broker from Elkins who negotiated the sale of the original 2,900-acre Regnery tract to Selmet:

## II

The Court agrees with the defendant's contention that the jury award of $250,000 actual damages and $500,000 punitive damages is excessive. Under the recent U. S. Supreme Court case of *Gertz v. Welch, supra,* it is permissible for a plaintiff in the position of Sprouse to recover punitive damages because of the high standard of proof required of a candidate for public office to sustain any action for libel. As it is necessary for a candidate for office to prove that false or misleading statements were published with knowledge on the part of the publisher of their falsity or with willful and reckless disregard of their truth, and further to prove that they were published with a deliberate intent to injure, punitive damages may be recovered.

However, regardless of the law of this State, it would appear that the penumbra of protection of the First Amendment is such that punitive damages may only be recovered in cases where the award of actual damages is insufficient to dissuade others in like circumstances from committing similar acts in the future. The policy embodied in the First Amendment of encouraging broad dissemination of public information forecloses an award of punitive damages which might jeopardize the existence of a newspaper when such damages are unnecessary to protect the public from similar conduct in the future or to make possible the vindication of plaintiff's

---

Q. Mr. Smith,—you are familiar, I take it, with that area, are you not?

A. Yes, sir.

---

Q. There is a headline there where "Governor Candidate Cleans Up." Does that property contain the Seneca Rocks? [The news photograph that appeared in Daily Mail Story was shown to witness] Is that Seneca Rocks on that property?

A. No, sir.

Q. How far away is the property that you all purchased from Seneca Rocks or from where "Governor Candidate Cleans Up"?

A. At least five miles—nine miles.

Q. And the Rocks had nothing to do with the property?

A. No, sir.

rights in the absence of demonstrable actual damages. In the case at bar the Court is of the opinion that an award of $250,000 actual damages is adequate for the purpose of dissuading publishers from similar willful and reckless conduct in the future. In addition the Court is persuaded that an award of $750,000 would have a chilling effect upon the legitimate exercise of First Amendment rights and would lead to the type of self-censorship which it has been the object and purpose of the United States Supreme Court to prevent since *New York Times v. Sullivan, supra.*

In viewing all of the evidence the Court is of the opinion that the plaintiff proved $250,000 in actual damages. The case of *Gertz v. Welch* specifically recognizes that actual loss to a plaintiff in a libel action is difficult to prove in the same mathematical way that medical expenses or lost earnings can be proven in an ordinary tort action. Mr. Justice Powell specifically says in *Gertz*, 418 U.S. at 350:

> "Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. Of course, juries must be limited by appropriate instructions, and all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury."

Under West Virginia law in an action to recover for an intentional tort, as opposed to a negligent tort, a plaintiff is entitled to have such elements as mental anguish, insult, indignity, and humiliation considered by the jury in arriving at an award for actual damages. *Addair v. Huffman,* ____ W. Va. ____, 195 S.E.2d 739 (1973).

The job of determining such intangible and subjective damages as personal humiliation, mental anguish, and indignity has always been the exclusive province of the jury subject to the gentle rule that awards in these areas not be excessive. In light of the amount of jury

awards for pain and suffering which are routinely sustained by appellate courts in tort actions involving physical injury, and considering the rank and station in life of the plaintiff at the time of publication, this Court finds that the award of $250,000 actual damages was not excessive.

## III

The defendant in this action objected to venue in Fayette County, West Virginia, on the grounds that *W. Va. Code*, 59-3-1(c) [1967] changed the law under which *Hanks v. Beckley Newspapers*, 149 W. Va. 552, 142 S.E.2d 727 (1965), was decided. *Hanks* held that an action against a newspaper may be brought in any county in which the cause of action, or any part of the cause of action arose, although the defendant is not a resident of that county, if the defendant, or if more than one defendant, one or more of the defendants, is a corporation under *W. Va. Code*, 56-1-2 [1923]. The opinion indicated that a newspaper is "circulated" in any county in which editions of the paper are sold and accordingly a part of the cause of action can be considered to have originated in any county where the newspaper is circulated and the libel is published.

*W. Va. Code*, 59-3-1 [1967] is a statute concerning newspapers and legal advertisements. Although in subsection (c) the statute says: "Notwithstanding any other provision of this *Code* or law to the contrary a qualified newspaper shall for all purposes be considered to be published where it is first placed in circulation," this *Code* section does not define the word "circulated" in a manner inconsistent with the *Hanks* case. Subsection (c) refers to where a newspaper is published as opposed to where a libel is published. Although for purposes of legal advertisements a newspaper is to be considered as "published" only in the county in which it is first placed in circulation, thus assuring that local newspapers will receive adequate support in the form of legal advertisements, that section in no way changes the common law definition of where a libel is "published." Accordingly we

reaffirm our holding in the *Hanks* case that proper venue in an action against a newspaper publishing corporation lies in any county in which the libel is published.

## IV

The defendant asserts that this action in the Circuit Court of Fayette County was barred *ab initio* by a previous dismissal of an action grounded on the same set of facts and filed in the Circuit Court of Kanawha County on October 28, 1968, just three days after the publications in question appeared in the *Daily Mail*. In that initial suit filed in Kanawha County, the defendants submitted a motion to dismiss on the grounds that plaintiff's complaint failed to state a claim upon which relief could be granted pursuant to Rule 12(b)(6) *W. Va. RCP*. The motion was granted by an order entered March 14, 1969, which stated:

> "This court is of the opinion to and does hereby sustain said motions to dismiss of the respective defendants, and, it is, accordingly ORDERED that said action be, and the same is hereby, dismissed for the reasons set forth in the letter memorandum of opinion of this court dated March 11, 1969, copy of which is hereby attached, and, it is further ORDERED that said letter memorandum of opinion dated March 11, 1969, be and the same is hereby made a part of the record, in this action, to all of which the plaintiff objects and excepts."

It is interesting to note that the letter memorandum of opinion accompanying this order also dismissed the *action* in Kanawha County. But the letter opinion is basically a critique of the *complaint* in all its allegations, one by one, and while the trial judge concluded that "the complaint completely fails to allege even the substance of any matter which might constitute a basis for this action," the opinion goes on to describe how a proper complaint for libel could be drafted indicating the alleged libelous material must set out *in haec verba*. The trial judge did not state that there was no possible way for the plaintiff correctly to amend the complaint, nor

did he state that the dismissal was with or without prejudice, nor did he expressly grant the right to amend. This Court is of the opinion that the trial judge in Kanawha County did not intend to dismiss the action, but rather intended to dismiss only the complaint. Therefore, while not necessary to the Court's decision, the Court believes that the peculiar facts of this case strengthen our holding that the Kanawha County action should not operate as *res judicata* to the subsequent action in Fayette County.

The plaintiff did not *sua sponte* seek leave to file an amended complaint, nor did he, by appeal or otherwise, seek to have the final order dismissing the action set aside or modified. Instead, on October 27, 1969, more than six months after the final order dismissing the Kanawha County action was entered, plaintiff filed the present suit in the Circuit Court of Fayette County alleging similar facts. Following denial of defendant's motion to dismiss for lack of venue in Fayette County, defendant moved for summary judgment setting forth the final Kanawha County judgment as a bar. The Fayette County court denied this motion and the defendant assigns the denial as error.

The issue presented is whether a 12(b)(6) dismissal for failure to state a claim is a final appealable judgment on the merits and, therefore, under the doctrine of *res judicata*, a bar to a subsequent action grounded on substantially the same facts.

West Virginia law has never squarely met this question, and when it has met it obliquely the decisions stand in direct conflict. On the one hand, there is a 1965 opinion of this Court in *U.S. Fidelity & Guaranty Co. v. Eades*, 150 W. Va. 238, 144 S.E.2d 703 (1965) which states:

> "If a summary judgment is entered under Rule 56 R.C.P. it is a dismissal with prejudice; whereas, a judgment sustaining a motion to dismiss under Rule 12(b) for the failure to state a claim

upon which relief could be granted is not a dismissal with prejudice."

On the other hand a 1969 decision, *Barker v. The Traders Bank*, 152 W. Va. 774, 166 S.E.2d 331 (1969), provides:

"... it should be observed that a judgment of dismissal of an action under Rule 12(b) or a final summary judgment under Rule 56, rendered by a trial court is not here reviewable upon certificate but can be reviewed by this Court only upon appropriate appellate process."

In addition, search for guidance on this subject in other jurisdictions is equally unavailing as there is a nationwide split of authority concerning whether an involuntary dismissal under Rule 12(b)(6) constitutes a bar to a subsequent prosecution of a new action alleging similar facts. The majority view and national trend favors the conclusionary nature of a 12(b)(6) dismissal as a determination on the merits. This view is based on the policy of protecting defendants from irresponsible forum-shopping by plaintiffs and on the policy of providing a definite end to litigation without fear by the prevailing party that actions, once dismissed, will be brought again. The rationale of this view is supported by the liberal amendment provisions of the Federal Rules which have been adopted by many states, including West Virginia.

The majority rule rests upon the authority of Rule 41(b) which says in part:

"Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this Rule, other than a dismissal for lack of jurisdiction or for improper venue, operates as an adjudication upon the merits."

Consequently under the majority rule a dismissal pursuant to a Rule 12(b)(6) motion falls within the contemplation of the plain meaning of Rule 41(b).

Courts which follow the majority view hold that a final judgment can be rendered on the pleadings alone.

*Olsen v. Muskegon Piston Ring Co.*, 117 F.2d 163 (6th Cir. 1941). For example, one court holding the majority view has stated that in cases where a motion to dismiss a complaint is sustained and the complaint is dismissed, and where the plaintiff does not desire to amend, he should announce his election to stand on his pleading, let a final order or judgment be entered dismissing the action, and then appeal from that order or judgment. *Crutcher v. Joyce*, 134 F.2d 809 (10th Cir. 1943). The rule of finality also applies when leave to amend the complaint is granted but not acted upon as well as when leave is not granted. *Matthews v. Wolvin*, 266 F.2d 722 (5th Cir. 1959). In the case of *Fyfe v. Pan-Atlantic S.S. Corp.*, 114 F.2d 72 (2nd Cir. 1940), the Court capsulized the majority view in stating that "[u]nder modern principles, failure to amend upon dismissal of a complaint under circumstances where amendment was permissible should bar the institution of a second suit."

To the contrary, however, a significant, though shrinking, number of jurisdictions follow the minority view which permits a second suit despite defective pleading in the original action. The policy underlying this position argues that dismissal for failure to state a claim never reaches the merits of a claim and, therefore, ought not to operate as *res judicata* because a litigant deserves to have his case decided on the merits.

For instance, in the case of *Rost v. Kroke*, 195 Minn. 219, 262 N.W. 450 (1935) judgment was entered and the complaint dismissed pursuant to an order sustaining a demurrer to the complaint for failure to state a cause of action. The complaint had alleged in the alternative facts constituting a good cause of action and facts which did not. The court held that the dismissal was not a bar to a subsequent suit in which the defective pleading was corrected by stating a good cause of action. Moreover, after a decision by a state court dismissing a complaint for failure to state a cause of action because it invoked the doctrine of *res ipsa loquitur* which was adjudged inapplicable, one federal court operating under the *Federal Rules* held that the dismissal was not *res judicata*

as to plaintiff's right to maintain an action in federal court on the same cause of action. *Bruening v. El Dorado Refining Co.,* 53 F. Supp. 356 (W.D. Mo. 1943).

The minority view makes one concession to the majority view in that it recognizes that if, in a prior action, leave to amend is expressly granted and the privilege is specifically refused, then the prior action does become *res judicata. Hacker v. Beck,* 325 Mass. 594, 91 N.E.2d 832 (1950). In the case at bar, however, leave to amend was not sought and was not granted.

Having pondered at length both majority and minority viewpoints, this Court is of the opinion that the majority view, which maintains that prior dismissal under Rule 12(b)(6) is a final judgment unless the Court specifically dismisses without prejudice, is the better view and should be adopted in this State; however, the Court further holds that it is only equitable to give our conclusion in this regard exclusively prospective application due to the extraordinary confusion in both this State and other jurisdictions with regard to the issue. The law of West Virginia was so unclear as to put the parties in the case at bar to playing a needless "game of forfeits," and furthermore, there was no conclusive guidance on the matter available from foreign jurisdictions, state or federal. In addition, the trial judge clearly intended to dismiss only the complaint and not the entire action.

This Court's policy with regard to procedural irregularities which needlessly interfere with a disposition on the merits was succinctly stated in the recent case of *Rosier v. Garron,* ___ W. Va. ___, 199 S.E.2d 50 (1973), where the Court said:

> ". . . [T]he distinction between procedural rules and substantive rights is frequently illusory. However, to the extent possible, under modern concepts of jurisprudence, legal contests should be devoid of those sporting characteristics which gave law the quality of a game of forfeits or trial by ambush."

This case raises, once again, the age-old conflict between society's need for predictability accomplished through legal formalism versus society's need to do justice in individual cases. Formality and order are values essential to the stability of any legal system, yet, as was articulated in detail in *Rosier, supra,* man's fundamental sense of justice constantly clashes with formalism when procedural impediments undesignedly lead to an unreasonable result. Results become logically insupportable when they are based upon a law which is unintelligible.

The Court holds, therefore, that the future law in this State with regard to dismissals under Rule 12(b) is that a judgment dismissing an action under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, and without reservation of any issue, shall be *presumed* to be on the merits, *unless* the contrary appears in the order, and the judgment shall have the same effect of *res judicata* as though rendered after trial in a subsequent action on the same claim. *1B Moore's Federal Practice,* (2nd Ed. 1974) § 0.409. We further hold that a judgment on the merits shall not require a determination of the controversy after a trial or hearing on controverted facts. It shall be sufficient that the record show that the parties might have had their controversies determined according to their respective rights if they had presented all their evidence and the court had applied the law, *Olsen v. Muskegon Piston Ring Co., supra.*

## V

The last of defendant's assignments with which this Court will deal are the alleged errors in the trial court's refusal to give defendant's instruction No. 14 and No. 7. Instruction 14 said:

"The court instructs the jury that the publications complained of by plaintiff were published on October 24 and 25 of 1968 and that the question of libel, falsity and actual malice must be

> determined as of the time the various publications were published."

Obviously a newspaper under the First Amendment cannot be held to a standard of omniscience and can be judged with regard only to information which is available to the newspaper at the time of publication. Therefore, the Court holds that it was error for the trial court to fail to give instruction No. 14 but that the error was harmless in light of all of the other instructions which were given in the case.

It is clear from a reading of plaintiff's instructions Nos. 1, 2a, 3, 7, and defendant's instructions Nos. 3 and 5 that the case was tried on the proper theory that a newspaper is to be judged concerning actual malice with regard only to information known by it at the time of publication.[10] In general, where it appears to this Court

---

[10] PLAINTIFF'S INSTRUCTION NO. 1

The Court instructs the jury that if you find by a preponderance of the evidence that one or more of the publications identified as Plaintiff's Exhibits Nos. 1 & 2 complained of constituted "libel", as that term is defined for you in these instructions, and if you further find by a preponderance of the evidence that the libelous publication or publications were false in some material particular; and if you further find by clear and convincing evidence that the libelous and false statements were published with actual malice, as defined in these instructions, then your verdict may be for the plaintiff, James M. Sprouse, and against the Charleston Mail Association.

PLAINTIFF'S INSTRUCTION NO. 2a

The Court instructs the jury that libel in a case brought by a nominee for public office may be defined as a false writing published by the publisher with knowledge of its falsity, or false publication published with a reckless disregard of its falsity, and which tends to injure the reputation of the nominee, to throw contumely or to reflect shame and disgrace upon him, or to hold him up as an object of scorn, ridicule, or contempt.

PLAINTIFF'S INSTRUCTION NO. 3

The Court instructs the jury that the term "actual malice" means that the defendant published false and defamatory statements with knowledge that they were false or with a reckless disregard of whether they were true or false.

PLAINTIFF'S INSTRUCTION NO. 7

The Court instructs the jury that even though failure to investigate, on the one hand, and mere ill will, bias spite or

that the effect of an improperly refused instruction is merely cumulative, and that the theory of the case enunciated in the refused instruction has been adequately covered by other instructions, and where it further conclusively appears that the outcome of the case would not have been affected by the giving of the re-

prejudice on the other, standing alone, are insufficient to establish either a knowledge of the falsity of, or a reckless disregard of the truth or falsity of the materials used; however, such evidence, if any, of motive, intent, may be considered for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity. Goldwater v. Ginzburg, 414 F.2d 324, 342.

DEFENDANT'S INSTRUCTION NO. 3

The Court further instructs the jury that all of the news stories and editorials published by the defendant, and complained of by the plaintiff, were constitutionally protected and require a verdict for defendant, unless:

First, one or more of the publications complained of constituted "libel" as that term is defined for you in these instructions;

Second, the libelous publication or publications were false in some material particular; and

Third, the libelous and false statements were published with "actual malice" as defined in these instructions;

The burden is upon the plaintiff to prove the first two of these essential elements by a "preponderance of the evidence" as that phrase is defined in these instructions;

The burden of proof to be borne by plaintiff with respect to the third essential element—actual malice—is more strict. The plaintiff has the burden of proving actual malice by "clear and convincing evidence".

The Court instructs the jury that by clear and convincing evidence is meant more than a mere preponderance of evidence. Clear and convincing evidence is that evidence which is so clear, explicit, and unequivocal [sic] as to leave no substantial doubt and which is sufficiently strong to command the unhesitating assent of every reasonable mind.

If you find that plaintiff has failed to establish any of these three essential elements by the standard explained, it is your duty to return a verdict for defendant.

DEFENDANT'S INSTRUCTION NO. 5

The Court instructs the jury that the term "actual malice," which must be established by clear and convincing evidence to warrant a verdict for plaintiff, means that defendant published false and defamatory statements with knowledge that they were false or with a reckless disregard of whether they were

fused instruction, this Court will not reverse for failure to give that instruction alone. *Jackson v. Cockill,* 149 W. Va. 78, 138 S.E.2d 710 (1964); *Morgan v. Price,* 151 W. Va. 158, 150 S.E.2d 897 (1966). The defendant is entitled to a fair trial; it is not entitled to a perfect trial because such a thing does not exist.

The defendant further argues that it was error to refuse defendant's instruction No. 7 which said:

> "The Court instructs the jury that in considering the news stories *complained of which quote* or attribute statements to Arch A. Moore, Jr., the Republican nominee for Governor, there was no legal duty on the part of defendant to subject Moore's statements to any test of truth; and that accordingly, since plaintiff has presented no evidence from which you could find that Moore's statements were not accurately and fairly reported, you may not return a verdict for plaintiff against defendant based on statements of Moore published by defendant, even though you may believe from the evidence that Moore's statements were libelous and false and that he was aware of the falsity or acted with a reckless disregard of whether they were true or false."

The Court holds that defendant's instruction No. 7 is not an accurate statement of the law as applied to the facts of this case. Although in general a newspaper is not liable for publishing in good faith statements of political candidates during an election campaign, the evidence in this case demonstrates that the statements of Arch A. Moore, Jr. were closely coordinated with the story generated by the defendant as part of an overall plan or scheme, the purpose of which was to discredit

---

true or false. Reckless disregard for the truth cannot be equated with negligence or what a reasonable man would have said under the circumstances.

Reckless disregard for truth or falsity implies a high degree of awareness of probable falsity. There must be clear and convincing evidence permitting the conclusion that the defendant in fact entertained serious doubts as to the truth of his false and defamatory publication.

plaintiff. Although the defendant would not have been liable for publication of the Moore statement if defendant were unaware at the time of publication of the falsity of the statement, the evidence in this case reasonably implies that at the time of publication the *Daily Mail* knew that the accusations made by Moore were false. Accordingly, in order for defendant's instruction No. 7 to have been given, it would have been necessary for the defendant to qualify it by admitting that the defendant would be liable for the Moore statements if the jury concluded that defendant published them with actual knowledge of their falsity or with willful and reckless disregard for their truth. *See,* generally: *Greenbelt Cooperative Publishing Association, Inc. v. Bresler,* 398 U.S. 6 (1970). As the defendant did not offer to amend the instruction to conform to the law, the instruction was properly refused.

Therefore, for the reasons set forth in this opinion, the judgment of the Circuit Court of Fayette County is reversed in part and affirmed in part, and the case is remanded to the Circuit Court with instructions to strike as a matter of Federal Constitutional law the jury award of punitive damages and to enter judgment on the jury verdict for $250,000 actual damages plus interest from date of judgment and costs.

Mr. Justice Haden and Mr. Justice Sprouse, deeming themselves disqualified, did not participate in the consideration or decision of this case.

> *Reversed in part,*
> *affirmed in part,*
> *remanded with*
> *instructions.*

## APPENDIX TO OPINION OF NEELY, J.

Charleston Daily Mail
Charleston, West Virginia
Thursday Evening      October 24, 1968

[Directly beneath the newspaper title and the date line appeared the following headline in normal size headline

type extending across the entire eight columns of the front page:]

Seneca Rocks Tourist Project Property Enriching
Candidate Sprouse

[Directly beneath this headline and also extending across the entire eight columns of print appeared a picture of the land allegedly purchased by Sprouse and his corporation. The caption beneath the photograph read:]

A New York corporation headed by Democratic gubernatorial candidate James M. Sprouse owns the land above, which is adjacent to a national recreation area in eastern West Virginia where the federal government has plans to develop a $30 million tourist attraction. The corporation already has made a handsome profit on its original investment, and retained the choice land in Pendleton County, like that shown in this photograph. The corporation was formed a month before the U. S. Forest Service completed its plans for the recreation area, and before the plan was approved by Congress. Much of the corporation's profits, to date, eventually will come from the U. S. Treasury.—Daily Mail Photo by Chester Hawes.

[Beneath the photograph and caption appeared the following headline in oversize type extending across five columns:]

PENDLETON REALTY BONANZA
BY JIM SPROUSE DISCLOSED

[The following sub-headline appeared next in normal size headline type printed across the two columns in which appeared the article:]

Cleanup of Nearly
$500,000 in View

By Bob Mellace
Daily Mail Political Editor

A corporation formed in New York and headed by Democratic gubernatorial candidate James M. Sprouse stands to make a very handsome profit dealing in prop-

erty adjacent to a $30 million federal recreation and tourism project in eastern West Virginia, the Daily Mail has learned.

The corporation already has made a profit of $48,176—most of which will come eventually from the U. S. Treasury—on an original investment of $134,620. And the valuation of its remaining holdings runs as high as $400,000, according to information obtained by this newspaper.

There is evidence the firm has violated state law by buying and selling property before it was qualified, as a foreign corporation, to do business in West Virginia. There is additional evidence it has never done any business in New York where it was chartered, and where the law permits incorporation by an agent without identifying the incorporators, which is forbidden by West Virginia law.

The corporation is 'Selmet Properties, Inc.,' and the only persons involved in it, from the records and information given the Daily Mail by the U. S. Forest Service, are Sprouse, Elkins real estate dealer and Democratic political figure Robert Hedrick, Pendleton County motel operator and Sprouse supporter Wilson Smith, and a New York lawyer.

All of the property involved is in Pendleton County. It is adjacent to or very near two of the state's greatest natural attractions—Spruce Knob and Seneca Rocks.

### $30 Million Outlay

E. M. Oliver, supervisor of the Forest Service in Elkins, said the federal government has plans to develop the entire area for recreation and tourism at a total estimated cost of $30 million, and work on it already is under way.

The development plan was completed in March, 1965 for presentation to Congress, after months of work on it by the Forest Service.

One month earlier, on Feb. 25, 1965, Selmet Properties was incorporated in New York by Jerome L. Grometstein, a New York Attorney who certified the office of the corporation was to be located in the city of New York.

A bill authorizing the project was introduced in Congress in April and passed in September, 1965.

On March 12, 1966, Selmet bought approximately 2,900 acres from Henry Regnery and his (See SPROUSE, pg. 11, Col. 1)

[At the top of Page 11 above the continuation of the story the following headline appeared in normal size headline type and extending across six columns:]

Sprouse Owns Choice Land Beside $30 Million U. S. Resort

[Beneath the headline and also covering six columns appeared a reproduction of a map showing the general area where the land was located, beneath which appeared the following caption:]

This is a map of the area where the federal government has plans to spend $30 million developing one of the major tourist attractions of the Eastern United States. A New York corporation headed by Democratic gubernatorial nominee James M. Sprouse owns some choice land in the area as shown by the heavy arrow between the community of Riverton and the road leading to Spruce Knob, the highest point in West Virginia. The knob and Seneca Rocks, a few miles from the corporation holdings, will be the chief attractions, but others are shown in this map prepared by the U. S. Forest Service, which will operate the recreation area in the Monongahela National Forest.

[Beneath the map and caption appeared the following two-column headline in oversize type:]

*Continued*
SPROUSE PENDLETON
BONANZA DISCLOSED

[Thereafter appeared the continuation of the story from the front page as follows:]

wife for $134,620 and paid cash for it according to the deed on record in the Pendleton County courthouse.

Between May 6 and June 7, 1966, Selmet conveyed seven parcels to various individuals for $67,932.75, with all of the deeds signed by Sprouse as president of the corporation. Much of the property was sold for $1,000 an acre in the bottomland of the North Fork of the South Branch of the Potomac River and U. S. Route 33, a main traffic artery between the two great natural attractions.

More than two months after it started selling property, Selmet registered in the office of the West Virginia secretary of state, required of foreign corporations before they can own property or do business in West Virginia according to the law.

Sprouse signed as president and Hedrick as secretary-treasurer, and stated Selmet owned 1,600 acres of land worth $75,000, as of Aug. 25, 1966.

## OFFICE IN CHARLESTON

Whereas the New York charter application showed the principal office of the firm as being in New York City, the West Virginia document shows the principal office as 700 Terminal Building, Charleston, where Sprouse has his law firm.

Three months after qualifying to do business here, Selmet sold a tract for $28,000 in a deed dated Nov. 26 and signed by Sprouse as president of Selmet.

That brought Selmet's take to $95,932 and was the last deed signed by Sprouse as president. All other deeds from that day to the present have been signed by Hedrick as president.

In January, 1967, Olliver said the Forest Service was approached by Smith, offering to sell a tract of 1,385 acres, and the service recommended in May that it be purchased.

Because the Forest Service did not have the money for the purchase at that time, Olliver said his office approached Nature Conservancy, Inc., of Washington to buy the tract and hold it for the service. Nature Conservancy is a non-profit corporation of dedicated conservationists who buy land for public agencies and hold it until the agency involved is prepared to buy it.

Selmet sold the acreage to Nature Conservancy on Oct. 2, 1968 for $81,364. That made Selmet's total gross income $182,796.75 more than it paid the Regnerys for its entire holdings.

Olliver said the only person he ever talked to about the deal was Smith, that he never knew who owned Selmet, and that he couldn't find out because at the time he inquired the firm was not incorporated in West Virginia.

There is no precise way to measure how much land Selmet has left out of the original Regnery tract because of the inaccuracy of deeds in the mountainous territory.

However, by deducting all of the land sold by Selmet, and using the Pendleton County land books as a guide, you come up with a total remaining of 404 acres.

Much of this appears to be in the bottomland and includes very flat property on the highway that will be attractive to developers of motels, service stations, etc., when the Forest Service completes the great tourist complex.

The Selmet property lies a few miles south of Mouth of Seneca, where the great rocks come in full view of the tourists. It is between Riverton and Secondary 13, a hard-base road that now leads up to Spruce Knob, the highest point in West Virginia, 4,862 feet.

All of the area lies within the Monongahela National Forest where a 100,000-acre tract has been designated

as the Spruce Knob-Seneca Rocks National Recreation Ara [sic].

Charleston Daily Mail,
Charleston, West Virginia
Friday Evening     October 25, 1968

[At the top of the front page of this day's edition appeared the following headline in oversize headline type across columns one through four:]

MOORE ASKS FEDERAL
PROBE INTO SPROUSE'S
PENDLETON LAND GRAB

[Directly beneath the following sub-headline which was printed in normal size headline type covering two columns appeared this news story:]

'Dummy Firm' Seen
Proving Corruption

BY BOB MELLACE
Daily Mail Political Editor

Congressman Arch A. Moore Jr. today asked for a full congressional investigation of the land dealings near a $30 million federal recreation project by a New York corporation headed by his Democratic opponent for governor, James M. Sprouse.

From what I have read in the newspaper and from information that has since come to me privately, it would appear that this land grab smacks of the same old Statehouse corruption, Moore said.

Yesterday's Daily Mail carried a story about Selmet Properties, Inc., which already has made a handsome profit in Pendleton County, near the new Spruce Knob-Seneca Rocks National Recreation Area, and stands to make much more.

The corporation, according to New York state records, was formed in February, 1965, a month before plans for the federal project were announced by the U. S. Forest Service.

Moore said:

"Here we have a dummy corporation, set up in the dark of night in the state [sic] of New York, which claims its assets consist solely of real estate in the State of West Virginia. This seems more than vaguely reminiscent of the Florida corporation scandals of a few months ago.

"I see no reason for the formation of such a corporation in the State of New York, unless you wish to conceal certain facts of the internal workings of the corporation, or to avoid disclosures as to the ownership of the corporation ... It is obvious there were other compelling reasons for these West Virginians to go outside the state for the formation of their company. I would like to know what they wished to hide. I think also that these questions should be answered:

"1. Who were the members of the corporation in addition to James M. Sprouse, Robert Hedrick and Wilson Smith?

"2. Did they have prior knowledge of the Forest Service recommendation that this area of land would be utilized as a portion of the federal recreation complex planned there?

"3. Where did the money for the purchase of this land come from?

"4. Were any individuals in (Se [sic] SPROUSE'S pg. 6, Col. 1)

[The story is continued on Page 6 under the one-word, one-column headline "Sprouse's":]

(Continued from Page One)

the federal government involved?

"5. Who was responsible for changing the boundaries of the recreation complex to include land owned by this corporation?

"6. Have any members of this corporation been involved in similar land sales to the federal government or its agents in this same area?

"7. Why was one tract of land, not contiguous and not needed for this recreatiornal [sic] facility, included in the sale?

"I believe that these questions should be answered in full. To this end, this day I am asking for a full investigation of this entire matter by the appropriate committee of the House of Representatives."

Sprouse has made no comment on the Daily Mail story of Thursday but called a news conference for 3 p.m. today, reportedly to discuss the story.

Hedrick was identified as an Elkins real estate dealer, active in Democratic party affairs, and a director of the U. S. Farmers Home Administration. Smith is a Pendleton County motel operator, also a Democrat and active in Sprouse's campaign.

Selmet Properties, according to the Daily Mail's information, did not sell land directly to the federal government.

Director E. M. Olliver of the Forest Service explained that, in cases where the service wants land and does not have money at hand to purchase it, there is a non-profit corporation of conservationists, Nature Conservancy, Inc., of Washington, D.C., that buys the land and holds it.

At the service's direction, Nature Conservancy bought a 1,385-acre tract from Selmet for $81,364. Olliver said the service now is in process of buying it from Nature Conservancy, at cost plus expenses.

The Nature Conservancy sale put Selmet's gross profits up to $48,176 on its original cash investment of $134,620, according to deeds on record in the Pendleton County courthouse. In addition, the corporation

has much valuable land left on the main highway through the big recreation complex.

[A second article appeared on Page 1 of the Daily Mail, placed directly adjacent to the above article. At the top of the page spanning columns five through eight appeared the following headline in normal size headline type:]

Where Governor Candidate 'Cleans Up'

[Below the headline appeared a photograph of the Seneca Rocks area which also spanned four columns. Beneath the photograph appeared the following caption:]

Seneca Rocks, above, are one of West Virginia's most scenic attractions but the U. S. government says they are worth only $7,900, according to D. C. Harper, in picture below, who says the rocks have been in his family more than 200 years. The government wants them for a new recreation area in Pendleton County and Harper says he will fight the condemnation action at the price offered. Meanwhile, down the road from the rocks, the government will pay $81,364 for property owned by a corporation headed by Democratic gubernatorial candidate James M. Sprouse, without a condemnation fight, and will take more property than it actually needs.—Daily Mail Photos by Chester Hawes.

[Beneath the above quoted caption appeared the following headline spanning four columns*]

FORTUNE TO JIM SPROUSE
BUT PITTANCE FOR SENECA

Landmark's Owners Plan
Court Fight Against Deal

[Under the headline and beside the story was a photograph of D. C. Harper extending across two columns under which was printed the caption:]

D. C. Harper . . . . Will Fight Rocks Project

[Beside the picture of Harper and beneath the headline appeared the following story:]

## BY BOB MELLACE
### Daily Mail Political Editor

The owners of Seneca Rocks, one of the greatest natural attractions in the Eastern United States, say the federal government has offered them $7,900 for their property. And they will fight it in a condemnation court.

But the same federal government will pay, indirectly, more than $81,364 to a New York corporation headed by Democratic gubernatorial nominee James M. Sprouse for what is mostly cutover hillside land just a short distance from the rocks.

And the U. S. Forest Service says it had to make concessions to the corporation to get the land it wants for a new road to Spruce Knob recreation area. It did not consider it necessary to condemn this land.

The service is developing a new recreation complex on 100,000 acres of the Monongahela National Forest and Seneca Rocks and Spruce Knob are the key attractions. It is estimated to cost $30 million.

Sprouse called a press conference at 3 p.m. today, reportedly to comment on yesterday's Daily Mail story about the New York corporation.

D. C. Harper lives at the Mouth of Seneca and says the rocks have been in his family more than 200 years. They are on a 73-acre tract. But, says Harper, that tract includes flat land fronting 1,100 feet on the main highway, U. S. 33—State Route 28, and land on that highway in the vicinity of the new development is selling for $1,000 an acre and more

## IN NAMES OF HEIRS

The rocks are now in the names of his two children and their children, according to Harper, who says they will fight the condemnation proceedings.

He adds that appraisals of the rocks have run from $9,000 to $40,000, and that he once refused to give an option on them for $150,000.

They are a great tourist attraction and a magnet for college students from all over the east who come to Mouth of Seneca every holiday to climb the rocks. The benefits to the owners are incidental to the operation of a general store opposite the rocks.

South of the rocks on U. S. 33 a few miles is the 2,900-acre tract purchased by Selmet Properties, Inc., for $134,620 in March 1966. In August of the same year, Sprouse signed as president when the corporation qualified to do business in West Virginia.

Selmet was chartered in New York in February, 1965, one month before the Forest Service disclosed its plans for the new recreation area. According to the records, it has done no business in New York, only in Pendleton County, West Virginia.

As of this month, Selmet had a gross profit of $48,176 from sales of some parcels from the original tract, but retains much valuable bottomland fronting on the highway and variously esti- (See LANDMARK, Pg. 6, Col. 4)

[On page 6 appeared the following headline above the continuation of the story:]

*Continued*
Landmark Owners
Offered 'Pittance'

mated at 400 acres worth $1,000 an acre.

A deed recorded May 7, 1966, and signed by Sprouse as president of Selment [sic] shows William Painter and others paid $12,000 to the corporation for 12 acres on the uphill side of the highway. It is an ideal location for a store and service station because it is at the intersection of the main highway and a rockbase road running up the mountain to Spruce Knob.

But, when the recreation complex is completed, that road won't be the main entrance to the new recreation area. A new road will be constructed on what once was Selmet property, and which will be flanked by Selmet property when it is in service.

## OLD ROUTE UNSUITABLE

The new road is what brought Selmet into the picture, according to E. M. Olliver, supervisor of the Forest Service at Elkins.

He told the Daily Mail that an engineering survey showed the present road to Spruce Knob, where Painter bought his property from Selmet, would not be suitable for traffic when the new complex is completed.

If it is any consolation to Painter, Olliver also said that improvements of the old road to the standards sought by the service would have required the taking of his property anyway.

However, Olliver continued, the survey showed the best location of a road to the Knob is a short distance north of the Painter property, on Blizzard Run. The Blizzard Run property provides the necessary width, alignment and grade needed for the new road, Olliver said, and added, "that's when we went to Selmet."

He did not know who Selmet was, he said, because the corporation was not registered at the secretary of state's office in Charleston. But Wilson Smith, a motel operator and Sprouse supporter in the current political campaign, came to the Forest Service in January, 1967, and offered the 1,385 acre tract.

The property, according to Olliver, includes the site of the new road, on the western side of the highway, some bottomland, and another tract on the eastern side of the highway, above the bottomland and far from the forest boundaries.

The Forest Service did not want all of that land, Olliver said, but Selmet refused to sell what the service wanted unless it took it all.

Why didn't the Forest Service condemn what it wanted, without taking the land on the opposite side of the highway?

"We didn't have to condemn," Olliver replied, "because it was a case of willing seller and willing buyer."

But Olliver and his property manager also disclosed that the Selmet property it did want, for the road, was not in the forest boundaries, which had to be extended to cover that property before it could be purchased.

The property on the other side of the highway, which it also had to buy, is not in the forest boundary. Its purchase was justified by Olliver, who said it qualifies for government purchase because it is suitable for national forest purposes.

The U. S. Forest Service did not have the available funds to buy the Selmet property, Olliver said, so it turned to Nature Conservancy, Inc., of Washington, D. C. This is a non-profit organization of conservationists who buy land wanted by the federal government for parks and other purposes and hold it until the government agency has the money to buy it back.

The Forest Service is now in the process of getting the land from Nature Conservancy, Olliver said, and will pay what Nature Conservancy paid to Selmet, plus any expenses Nature Conservancy incurred in the purchase.

Selmet conveyed the 1,385 acres to Nature Conservancy Oct. 7, 1968, for $81,364. Robert Hedrick of Elkins signed as president of Selmet, with Smith as vice president, according to the deed on record at the courthouse in Franklin.