456 A.2d 1366

**Honorable Joseph P. BRAIG, Appellant,**

**v.**

**FIELD COMMUNICATIONS and Lloyd George Parry.**

Superior Court of Pennsylvania.

Argued Oct. 27, 1982.

Filed Jan. 14, 1983.

Reargument Denied March 29, 1983.

Petition for Allowance of Appeal Denied June 24, 1983.

570

James Edwin Beasley, Philadelphia, for appellant.

David H. Marion, Philadelphia, for Field, appellee.

Gregory M. Harvey, Philadelphia, for Parry, appellee.

Before HESTER, WICKERSHAM and POPOVICH, JJ.

HESTER, Judge:

This is an appeal from two Orders of the Common Pleas Court of Philadelphia dated January 9, 1981, granting summary judgment in favor of appellees Lloyd George Parry (Parry) and Field Communications (Field).[1] Appellant Braig filed a complaint on April 21, 1980, alleging a defamation action against Parry and Field.

---

1. The Orders were issued by Judge Domenic D. Jerome, of the Court of Common Pleas of Delaware County, who specially presided over this case. However, venue remained in the Court of Common Pleas of Philadelphia County.

Parry was at all times relevant to this lawsuit an Assistant District Attorney and Chief of the Police Misconduct Unit of the District Attorney's Office of Philadelphia County. Field Communications is a corporation which owns WKBS–TV, Channel 48. WKBS–TV 48 "published" a television program entitled "On Target—The Bowe Case", which was taped on September 10, 1979, broadcast on September 23, 1979, at 11:30 p.m., and rebroadcast without change on September 29, 1979, at 10:00 a.m. Parry participated in the program representing the Police Misconduct Unit of the District Attorney's Office. The program concerned the trial of Officer Thomas Bowe, who had been charged with the murder of a 19-year-old Philadelphia resident, Cornell Warren. This trial attracted a significant amount of public debate and generated an equal amount of controversy due to the fact that there had been a number of incidents of alleged excessive use of force by police officers against blacks. Officer Daryl Bronzeill, Bowe's partner, was charged with recklessly endangering the life of Warren, as well as simple assault and aggravated assault. Both cases were prosecuted by Robert Campolongo, an Assistant District Attorney who served in the Police Misconduct Unit under the supervision of Parry.

Appellant, a Judge in the Court of Common Pleas of Philadelphia County, presided at the trial of Officer Bronzeill. The trial was aborted when appellant, on his own motion, declared a mistrial on the ground of "intentional prosecutorial misconduct". Officer Bowe was acquitted by a jury in a trial before Judge John Geisz.

The 30-minute television program at issue was moderated by Brahin Ahmaddiya, who had been serving as moderator and associate producer of the regularly scheduled weekly "On Target" programs. The "On Target" program had been presented by Channel 48 for a number of years. It was designed to provide a forum for serious discussion by knowledgeable panelists concerning minority-affairs matters of current public interest.

Ahmaddiya and Leon Haines, an employee of Channel 48 and producer/director of "On Target", selected the participants for the program, which was approved for broadcast by Martin Jacobs, Channel 48's manager of news and public affairs. Originally, Ahmaddiya was to have three guests on the show: Benjamin Johnson, a prominent black criminal defense attorney who had represented Cornell Warren's family, Campolongo, and Parry. Campolongo, however, could not attend. Therefore, the on-camera participants were Ahmaddiya, Johnson, and Parry. In accordance with normal station procedure, no script or list of questions was prepared in advance.

The program centered upon the prosecution of Officer Bowe. As the panelists discussed the case, Johnson was critical of the prosecutorial style of Campolongo, the Assistant District Attorney who prosecuted both cases, and was particularly critical of the decision to have Campolongo prosecute the Bowe case after the Bronzeill prosecution had been thrown out by Judge Braig for Campolongo's prosecutorial misconduct. To underscore this point, Johnson quoted a statement critical of Campolongo which had been made by Judge Braig during the Bronzeill trial. The following colloquy then occurred:

Parry: I was going to say that if you want to use Judge Braig's statement, you know, you are opening up a whole other area. In fact, it was a whole other case in terms of the presentation that was made to the court. Judge Braig is no friend of the police brutality unit. I don't care who we sent in to try that case, in my opinion, that case was going to get blown out.

Ahmaddiya: Okay, we have to ask this question—

Johnson: This is the second time, no matter which judge they have, they accuse the judge of blowing the case out.

Parry: Judge Geisz didn't blow the case out.

This colloquy took approximately thirty seconds of the thirty minute program. It came near the show's end as Ahmaddiya was preparing to summarize and close the program.

The videotaped program was broadcast as scheduled on September 23, 1979. A day or two later appellant telephoned Kenneth T. MacDonald, then Vice President and General Manager of Channel 48. Appellant stated that he had been told that an objectionable reference to him had been made on the On Target program which had aired the previous Sunday. Appellant said he had not seen the program and asked for a copy of the transcript. MacDonald explained that a transcript had not been made, but told appellant he could send his secretary to the station so that she could watch the program and write down any statement concerning him. Judge Braig said that he understood the program was to be rebroadcast. MacDonald acknowledged that it was scheduled to be aired again on the coming Saturday. MacDonald offered to view the program tape and call the appellant the next day.

MacDonald instructed a member of the station's crew to make a cassette tape of the program. The next day, MacDonald viewed the tape with Joseph R. Weber, the station's Program Manager. Although MacDonald did not know exactly what he was looking for, in his words, "... when the judge's name was brought up, we played it back a couple of times and went over it." MacDonald subsequently viewed the program by himself. On September 27, 1979, Judge Braig called MacDonald. MacDonald told Braig that he had found nothing objectionable on the tape. He then said he would have the tape cassette of the program hand-delivered to the Judge. MacDonald verified that the program was going to be rebroadcast on September 29, 1979. Instead of hand-delivering the tape, the tape was mailed. Judge Braig did not receive it until Monday, October 1, 1979.

■ The lower court held that the words complained of by Judge Braig are capable of a defamatory meaning.[2] The

2. The trial judge correctly observed that in Pennsylvania, it is the function of the trial court, in the first instance, to determine whether "the communication complained of is capable of a defamatory meaning. If the court so finds, then it is for the jury to determine whether

lower court also held that no absolute privilege protected Parry as an Assistant District Attorney and that no conditional privilege protected Field. However, the lower court entered summary judgment on behalf of both defendants on the basis of its conclusion that "as a matter of law plaintiff cannot prove actual malice against either defendant."

We first address the standard of review in this case. Recently, there has been considerable attention devoted to the standard of review applicable to a defamation action which has been disposed of by summary judgment pursuant to Pa.R.C.P. No. 1035. See *Curran v. Philadelphia Newspaper, Inc.*, 261 Pa.Super. 118, 395 A.2d 1342 (1978), affirmed in part and reversed in part, 497 Pa. 163, 439 A.2d 652 (1981); *Brophy v. Philadelphia Newspaper, Inc.*, 281 Pa.Super. 588, 422 A.2d 625 (1980), (petition for allowance of appeal denied). It is undisputed that, in a defamation case,

"... summary judgment should be granted only when warranted under Pa.R.C.P. No. 1035, i.e., where the evidence viewed in the light most favorable to the non-moving party, reveals an absence of a genuine issue as to the existence of actual malice as defined in *New York Times Company v. Sullivan*, [376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)]."

*Id.*, 281 Pa.Superior at 599, 422 A.2d at 631.

Recently, the Supreme Court of Pennsylvania, in *Curran v. Philadelphia Newspapers, Inc.*, supra, clarified the standard of review applicable to a motion for summary judgment in a defamation action. The Court stated:

"The inquiry, therefore, is whether the evidence submitted to the court on a defendant's motion for summary judgment would permit the plaintiff to meet the actual malice standard.

Summary judgment is proper 'only if the evidence then before the court is such as would warrant the granting of a defendant's point for binding instructions after trial.'

it is so understood by those hearing the statement." *Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 442, 273 A.2d 899, 904 (1971).

*Bremmer v. Protected Home Mutual Life Insurance Company,* 436 Pa. 494, 497, 260 A.2d 785, 786 (1970)." *Curran,* supra, 497 Pa. at 177, 439 A.2d at 659.

The Court also emphasized the applicability of the rule "[t]hat trial by testimonial affidavit is prohibited.... The prohibition against reliance upon the testimonial affidavits of the moving party is derived from the famed case of *Nanty-Glo Borough v. American Surety Company,* 309 Pa. 236, 163 A. 523 (1932)." *Id.,* 497 Pa. at 183, 439 A.2d at 662; See also *Thompson Coal Company v. Pike Coal Company,* 488 Pa. 198, 204, 412 A.2d 466, 468–69 (1979).

The Court concluded:

"We are satisfied that case law of the Supreme Court of the United States supports our adherence to the Nanty-Glo rule in this controversy over the existence of actual malice. Recently, in *Hutchinson v. Proxmire,* 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979), the Supreme Court 'express[ed] some doubt' about the 'rule' favoring the use of summary judgment in determining whether a plaintiff has adequately shown actual malice under *Times v. Sullivan.*"

*Curran,* supra, 497 Pa. at 181, 439 A.2d at 662. Therefore, in *Curran,* the Supreme Court viewed the evidence in the light most favorable to the appellant and did not rely upon any of the testimonial affidavits of the moving party.[3]

The Court, nevertheless, acknowledged that a plaintiff has a greater burden of proof in a defamation action as a result of the First-Amendment policy expressed in *New York v. Sullivan,* supra, 497 Pa. 180, 439 A.2d at 660. See also Opinion in Support of Affirmance by Spaeth, J. in *Curran,* supra, 261 Pa.Super. at 118, 395 A.2d at 1346; concurring opinion of Spaeth, J. in *Brophy,* supra, 281 Pa.Super. at 604, 422 A.2d at 634; dissenting opinion by

---

**3.** In *Curran,* the Court affirmed the granting of defendant's motion for summary judgment with respect to its coverage of appellant's resignation. The Court based its decision upon the finding that appellant's own deposition evidence established that the defendant's reporter had received his information from a reliable source. Therefore, as a matter of law, appellant was unable to prove actual malice.

Justice Brennan to the Denial of Certiorari in *Lorain Journal Company v. Milkovich*, 449 U.S. 966, 101 S.Ct. 380, 66 L.Ed.2d 232 (1980).

We note that appellant in the instant case has argued in the lower court and preserved on appeal the contention that he is not a "public figure" within the meaning of *New York Times v. Sullivan* and its progeny. Although appellant concedes he is certainly an elected "public official", he, nevertheless, maintains that he is not a "public figure" and should not be required to prove actual malice on the part of the defendants, since, on September 23 and September 29, 1979, when publication was made, *Bronzeill* was still pending before him on post-trial motions. Therefore, the Code of Judicial Conduct would have prohibited him from publicly commenting on this case. The appellant argues that, since the underlying reasoning in *New York Times v. Sullivan* and its progeny is that a "public figure" has an opportunity to respond to any criticism as a result of ready access to the media, he is not a "public figure" since he was unable to respond to Parry's statements. See *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 959, 47 L.Ed.2d 154 (1976); *Hutchinson v. Proxmire*, supra; *Wolston v. Readers Digest Associations, Inc.*, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979).

We reject this contention. In *Gertz*, supra, the Supreme Court rejected the previous plurality opinion in *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), which held that the *New York Times* privilege extended to defamatory falsehoods relating to private persons if the statements concerned matters of general or public interest. The Court, in *Gertz*, adopted a public figure/private figure distinction and emphasized:

"More important than the likelihood that private individuals will lack effective opportunities for rebuttal, there is a compelling normative consideration underlying the distinction between public and private defamation plaintiffs. An individual who decides to seek governmental

office must accept certain necessary consequences of that involvement in public affairs. He runs the risk of closer public scrutiny than might otherwise be the case. And society's interest in the officers of government is not strictly limited to the formal discharge of official duties. As the Court pointed out in *Garrison v. Louisiana,* 379 U.S. [64], at 77, 13 L.Ed.2d 125, 85 S.Ct. 209 [at 217], the public's interest extends to 'anything which might touch on an official's fitness for office ... Few personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation, even though these characteristics may also affect the official's private character.' " 418 U.S. at 344, 345, 94 S.Ct. at 3009, 41 L.Ed.2d at 808.

"Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures *and those who hold governmental office* may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth. This standard administers an extremely powerful antidote to the inducement to media self-censorship of the common-law rule of strict liability for libel and slander. And it exacts a correspondingly high price from the victims of defamatory falsehood. Plainly many deserving plaintiffs, including some intentionally subjected to injury, will be unable to surmount the barrier of the New York Times test. Despite this substantial abridgment of the state law right to compensation for wrongful hurt to one's reputation, the Court has concluded that the protection of the New York Times privilege should be available to publishers and broadcasters of defamatory falsehood concerning *public officials and public figures.*" (emphasis supplied).

*Gertz,* supra, at 342–43, 94 S.Ct. at 3008, 41 L.Ed.2d at 807. In the instant case, Judge Braig voluntarily decided to seek public office as a Judge in the Court of Common Pleas of

Philadelphia County. He, therefore, willingly accepted certain necessary consequences of that involvement in public affairs including the risk of closer public scrutiny. Presumably, Judge Braig's decision to seek his office was also made with knowledge that he would be bound by Canon 3 A. (6) of the Code of Judicial Conduct, which prohibits "... public comment about a pending proceeding...."

■ As stated by the lower court:

"Nonetheless we are aware of the occupational hazards of being a Judge and we agree that 'Judges are suppose to be men of fortitude, able to thrive in a hardy climate.' *Craig v. Harney*, 331 U.S. 367 at 376 [67 S.Ct. 1249 at 1255, 91 L.Ed. 1546] (1947). We would substitute 'persons' for 'men' in today's society."

As stated in *Gertz*, supra:

"We begin with the common ground. Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide open' debate on public issues. *New York Times Company v. Sullivan*, [supra]."

*Gertz*, supra, at 339–40, 945 S.Ct. at 3007, 41 L.Ed.2d at 805. Although the lower court held that appellant did not establish a genuine issue as to any material fact and that, as a matter of law, he could not prove actual malice against either defendant, it also concluded that Parry's remarks constituted expressions of opinion concerning the performance of appellant's official duties. As correctly stated by the lower court, whether a particular statement constitutes fact or opinion is a question of law. *Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974), *Doman v. Rosner*, 246 Pa.Super. 616, 371 A.2d 1002 (1977).

■ Although Parry's statement does contain the qualification "in my opinion", the entire statement[4] is not absolutely privileged as a result of *Gertz*, supra.

The lower court held "in the case at bar, the court is of the opinion that these statements can reasonably be interpreted to indicate that he [Judge Braig] was biased in favor of the police and against the police brutality unit. Finally, it can also be interpreted as meaning that the case was fixed. . . ." We agree with the lower court's interpretation of Parry's statement, that it is ". . . capable of a defamatory meaning and a jury could so find."

■ However, we disagree that Parry's remarks constituted an expression of opinion within the meaning of *Gertz*, supra. Concerning this point, we adopt Section 566 of the Restatement (Second) of Torts (1977), which states:

**Expression of Opinion.**

A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.

Comment b to Section 566 provides a suitable analysis regarding the types of opinion:

"There are two kinds of expressions of opinion. The simple expression of opinion, or the pure type, occurs when the maker of the comment states the facts on which he bases his opinion of the plaintiff and then expresses a comment as to the plaintiff's conduct, qualifications or character. . . . The second kind of expression of opinion, or the mixed type, is one which, while an opinion in form or context, is apparently based on facts regarding the plaintiff or his conduct that have not been stated by the defendant or assumed to exist by the parties to the communication. Here the expression of the opinion gives rise to the inference that there are undisclosed facts that

---

4. "Judge Braig is no friend of the Police Brutality Unit. I don't care who we sent in to try that case, in my opinion, that case was going to get blown out. . . . Judge Geisz didn't blow the case out."

justify the forming of the opinion expressed by the defendant..."

If the defendant states certain non-defamatory facts concerning the plaintiff, on the basis of which he expresses a defamatory opinion, Comment c to Section 566 recognizes that this "pure" expression of opinion is absolutely privileged as a result of *Gertz,* supra. Comment c states:

"The distinction between the two types of expression of opinion, as explained in Comment b, therefore, becomes constitutionally significant. The requirement that a plaintiff prove that the defendant published a defamatory statement of fact about him that was false (See Section 558) can be complied with by proving the publication of an expression of opinion of the mixed type, if the comment is reasonably understood as implying the assertion of the existence of undisclosed facts about the plaintiff that must be defamatory in character in order to justify the opinion. A simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable this opinion may be or how derogatory it is...."

In reviewing Parry's remarks, we are convinced that they do not constitute a "pure" expression of opinion, which would be absolutely privileged as a result of *Gertz.* His remarks concerning Judge Braig could reasonably be interpreted as a simple statement of fact, e.g., "Judge Braig is no friend of the Police Brutality Unit." However, at least, his remarks constitute a "mixed" expression of opinion made on the basis "... of undisclosed facts about the plaintiff that must be defamatory in character in order to justify the opinion." See *Beckman v. Dunn,* 276 Pa.Super. 527, 419 A.2d 583, 587 (1980).

Therefore, on the basis of the foregoing, we address the issue whether appellant's evidence, viewed in the light most favorable to the appellant, establishes a sufficient question of fact concerning the issue of actual malice so as to permit the case to proceed before a jury. We find that

appellant's evidence does present a genuine question of fact, so that a jury could find the existence of actual malice with convincing clarity as to both defendants.

It is elementary that actual malice involves a knowing falsehood or a reckless disregard of the truth or falsity of a publication. *New York Times, Inc. v. Sullivan*, supra. As stated in *Brophy*, supra,

> "The rationale for this admittedly strict standard is the recognition that 'erroneous statement is inevitable in free debate, and that it must be protected if the freedoms of expression are to have the breathing space that they need ... to survive ...' *New York Times, Inc. v. Sullivan*, supra, 376 U.S. at 271–72, 84 S.Ct. at 721, 11 L.Ed.2d at 701.... This constitutional protection extends to the 'honest utterance, even if inaccurate' but not to the 'calculated falsehood.' *Garrison v. Louisiana*, 379 U.S. 64, 75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125, 133 (1964)."

*Brophy*, supra, 281 Pa.Super. at 602, 422 A.2d at 633. In *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968), the Court stated that a "public figure" plaintiff could establish reckless disregard for truth or falsity on the basis of "sufficient evidence to permit the conclusion that the defendant, in fact, entertained serious doubt as to the truth of his publication."

■ With respect to defendant Parry, his remarks were not so closely related to his duties as Assistant District Attorney as to bring him within the scope of the district attorney's privilege. While he might have been invited to appear on the television show, the purpose was to discuss the *Bowe* case. This did not give him the right to say whatever he wanted to say on any other subject. His statement relating to Judge Braig and the *Bronzeill* case had nothing to do with the program itself nor with Parry's duties as Assistant District Attorney. Parry never asked, neither before nor after September of 1979, for the recusal

of Judge Braig in the *Bronzeill* case.[5] Furthermore, as pointed out by the lower court, Parry never sought any review of Judge Braig's decision or conduct by the Judicial Inquiry and Review Board. On March 30, 1979, Parry sent a letter to Judge Braig demanding that the *Bronzeill* case be listed for trial, despite Judge Braig's decision to grant a mistrial "based on intentional prosecutorial misconduct". His letter also objected to the granting of the mistrial *sua sponte*.

Parry admits to the fact that Campolongo had a "problem" of being "cited for prosecutorial misconduct". Parry testified at his deposition as follows:

Q. Well, did you find that out before or after the Bronzeill matter?

A. Well, I found out about Mr. Campolongo's background when I assumed my duties with the district attorney's office, which was before the Bronzeill case.

Q. Was there a case tried by Mr. Campolongo which resulted in a reversal because of his conduct in Court?

A. I'm sure there was.

Q. What do you mean, you are sure there was?

A. Well, yes.

Q. Was there more than one case?

A. Yes.

Q. Did you discuss this with Mr. Campolongo?

A. Yes.

Q. Before or after the Bronzeill matter?

A. Before Bronzeill.

Q. And how many cases do you understand he had been cited either by a trial judge or an appellate judge for prosecutorial misconduct?

5. Judge Braig recused himself on October 29, 1979. Subsequently, Judge Gafni ruled upon the district attorney's petition for a new trial, which was denied. No appeal was taken.

A. I don't know about citations by trial judges. I know of one appellate decision and possibly another appellate decision.

More importantly, in an apparent attempt to justify his remarks concerning Judge Braig, Parry explained that he had conducted a "survey" because he had "... wanted to find out if Judge Braig would be a fair and impartial judge in the case."

The only other "police brutality" case in which Judge Braig presided was *Commonwealth v. Judge and Salarno,* in which Judge Braig found both defendants guilty. On the basis of the post-trial motion of subsequently-appointed counsel, Judge Braig granted a new trial based upon *Commonwealth v. Mabie,* 467 Pa. 464, 359 A.2d 369 (1976) (concerning the issue of ineffective assistance of counsel). He did so following his denial of original counsel's post-trial motions, and he stated on the record his disagreement with *Mabie.* This case was tried two years before Parry came to Philadelphia, and Parry admits that he never read the transcript.

Parry claims that he consulted with assistant district attorney Harry Spaeth, who tried the *Salarno-Judge* case. Parry concedes that he did not know that post-trial motions were filed by original trial counsel and denied by Judge Braig. Parry admits that he did not know if any appeal was taken by the district attorney's office or if Judge Braig was affirmed by the Superior Court. Parry admits knowing that the case had been retried and that the defendants had been acquitted.

Concerning his discussion of *Salarno-Judge* with Assistant District Attorney Spaeth, Parry testified at his deposition, as follows:

"And that during the course of this side bar, Judge Braig had stated to Mr. Spaeth that he, Judge Braig, was going to be attending a banquet given by the Fraternal Order of Police during—it was going to be that night, which would be during the course of the trial, and did Mr. Spaeth have any objection to Judge Braig attending this

banquet, especially in light of the fact that Mr. Pirillo [defense counsel for the policeman] was also going to be present.

Mr. Spaeth said that he had no problem with that, and that he had heard later that during the course of the banquet, Mr. Pirillo, who had been one of the speakers from the rostrum, had kidded Judge Braig about the fact that they had a police brutality case in progress, and that the next day, to the surprise of Mr. Spaeth, Judge Braig found Mr. Pirillo's clients guilty, and then at some later time ruled that the conviction should be overturned or that a new trial should be granted because Mr. Pirillo had been ineffective as counsel for the defendants."

Parry also claims that he spoke to District Attorney Rendell, who never tried a case before Judge Braig. Rendell never indicated that he believed that Judge Braig was biased in favor of the police. Rendell personally told Judge Braig in January, 1980, that Parry had indeed "gone too far" in his statements on Channel 48.

Parry also discussed Judge Braig with Campolongo, who had not tried a case before Judge Braig prior to *Bronzeill.* Parry also claims that he discussed Judge Braig with "many others". However, Parry never identified any of these individuals. Judge Braig conducted his own independent inquiry of three assistant district attorneys, who tried the greatest number of cases before him, and each told Braig that they never spoke to Parry.[6]

The only civil matter heard by Judge Braig involving police officers as parties, *Brophy v. Philadelphia Newspapers, Inc.,* supra, was a defamation suit filed by three police officers against the Philadelphia Inquirer, which was decided prior to *Bronzeill.* Judge Braig granted summary judgment against the police officer-plaintiffs, which was affirmed by the Superior Court.

6. At this point, we note that we are summarizing this evidence in the light most favorable to the plaintiff, without deciding the truth or falsity thereof.

Finally, in a further attempt to justify his remarks concerning Judge Braig, Parry stated that he conducted an investigation into Judge Braig's background. Appellant properly argues that Parry's motives for this investigation, as well as the accuracy of the information he gained by it, are material to the issue of actual malice. Appellant emphasizes "... two egregious errors, which apparently were fundamental facts in Parry's analysis leading him to a conclusion that Judge Braig was biased in favor of the police." These errors are that Parry stated (1) Judge Braig was the campaign manager for Mayor Frank L. Rizzo; whereas, he was actually a part-time unpaid volunteer; and (2) "Mayor Rizzo had been responsible for his ascension to the bench"; whereas, Judge Braig had actually been elected to the bench in 1975.

Finally, Parry testified at his deposition as follows:

"Generally, if the matter is pending before a judge, I would consider it to be improper to comment upon the issues involved in that matter pending before the judge, yes." [7]

■ On the basis of the foregoing, we hold that there is a genuine issue which should be presented to the jury concerning Parry's actual malice. This evidence is sufficient to permit a jury to decide whether Parry entertained "serious doubts" concerning the truth of his defamatory statement. *St. Amant,* supra, 390 U.S. at 731, 88 S.Ct. at 1325, 20 L.Ed.2d at 267.

Concerning Field, Judge Braig testified that he specifically told the General Manager Kenneth MacDonald that he objected to Parry's accusing him of "blowing out" the case. Judge Braig also told MacDonald that he considered the statement an attack on his integrity. Judge Braig also

7. Parry did not admit that he knew the *Bronzeill* case was still pending before Judge Braig. However, we accept as true, for the purposes of this opinion, that the case remained before Judge Braig until October 29, 1979, when he recused himself.

testified that, when he first contacted MacDonald on September 26, 1979, MacDonald said he would be "shocked" if his employees would allow such a statement to be broadcast. Judge Braig also testified that on September 27, 1979, he again told MacDonald that he believed the words "blow out" to mean "illegal, unethical and corrupt". MacDonald refused Judge Braig's request to come to the station to view the tape. MacDonald admits that he offered to have a duplicate tape *hand-delivered* to Judge Braig prior to rebroadcast. MacDonald admits having viewed the tape prior to rebroadcast on at least two occasions and further admits that when Judge Braig's name was mentioned "... we played it back a couple of times and went over it".

Appellant does not contend that he could establish actual malice on the part of Field as a result of the initial broadcast. Appellant argues that there is "clear and convincing" evidence of actual malice on the basis of what transpired between the original broadcast and the rebroadcast on September 29, 1979. Viewing the evidence in the light most favorable to the plaintiff, we agree.

A jury should decide MacDonald's "state of mind" in deciding to rebroadcast the program. By his own account, MacDonald went over and over the tape. A jury could properly infer that he had "serious doubts" concerning the truth of the statements. Otherwise, this broadcast executive, with 30 years in the industry, would never have repeatedly reviewed the tape. A jury could find that MacDonald, as agent for Field, wanted to air the program a second time, despite "serious doubts" from his multiple viewings and from what Judge Braig had already told him concerning the truth, as well as the meaning, of the statements. A jury could also conclude that MacDonald did not want Judge Braig to view the tape prior to the scheduled rebroadcast on September 29, 1979. Accordingly, the tape was mailed, not hand-delivered, on Friday, September 28, 1979.

More importantly, during his deposition, Mr. MacDonald explained the "fairness doctrine", which is part of the National Association of Broadcaster's Code, as follows:

"To start with, the program most certainly should be balanced, and if there's only one side of the view, that would be objectionable. It could well be that something that was defamatory or slanderous could have been said. I'm sure that that's what the judge was talking about."

MacDonald admitted that he was responsible for the overall direction of the station and that he had final responsibility for developing station policy. He admitted that he was the ultimate authority with respect to editing or cancelling programs to avoid the publication of untruths or slanderous remarks.

It cannot be disputed that the program "On Target—The Bowe Case" was not "balanced" within the meaning of the "fairness doctrine". Parry, Campolongo, and Johnson were the only invited guests. Ahmaddiya, Parry and Johnson were the only on-camera participants. Defense counsel for Bowe had not been invited. Furthermore, since the program was not intended to concern the *Bronzeill* case, defense counsel for Bronzeill had not been invited, and neither Judge Braig nor Judge Geisz had been invited. Finally, since the program was intended to only concern the *Bowe* case, it is apparent that Parry's comments concerning Judge Braig and the *Bronzeill* case were incidental, unplanned, and unnecessary to the theme of the program.

Under these circumstances, a jury should decide MacDonald's "state of mind" in deciding to rebroadcast the program over Judge Braig's objection. *Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979).

Finally, under the circumstances of this case, summary judgment is not a "preferred" method of disposition. See *Curran,* supra. *Brophy,* supra. On the basis of now-famous footnote 9, the United States Supreme Court, in *Hutchinson v. Proxmire,* 443 U.S. 111, 120 n. 9, 99 S.Ct.

2675, 2680 n. 9, 61 L.Ed.2d 411, 422 n. 9, has expressed its "... doubt about the so-called 'rule' [favoring summary disposition of defamation actions]. The proof of 'actual malice' calls a defendant's state of mind into question, [citation omitted], and does not readily lend itself to summary disposition. [citations omitted]."

In *Brophy,* supra, 281 Pa.Superior at 610, 422 A.2d at 637, Judge Spaeth correctly noted that, with respect to constitutional issues, "We are always able to permit greater freedom in this Commonwealth than do the federal courts. [citations omitted]." 281 Pa.Superior 610, 422 A.2d at 637. However, on the basis of the Supreme Court's decision in *Curran,* supra, it is clear that Pennsylvania has decided not to expand the freedoms of the First Amendment in this area. We are bound by that decision.

Reversed and Remanded to the jurisdiction of the lower court with Instructions to deny defendants' motions for summary judgment and proceed to trial by jury.

Jurisdiction is relinquished.

POPOVICH, J., files a concurring and dissenting statement.

POPOVICH, Judge, concurring and dissenting:

I concur in the result that the majority reaches regarding appellee-Parry's susceptibility to suit because his statements are capable of a defamatory meaning. However, I must dissent from the majority's reversal of summary judgment as to the other appellee, Field Communications. Field Communications was merely the conduit of the information, and, under the particular circumstances here, I find that there was no showing of malice attributable to Field in its capacity as a disseminator of information to the public, notwithstanding appellant's protestation that the information was false prior to the rebroadcast.