**Sarandrea v. Sharon Herald Co.**

200

C.P. of Lawrence County, no. 1206 of 1993, C.A.

*Lawrence M. Kelly,* for plaintiff.
*William C. Kuhn,* for defendants.

PRATT, *J.,* January 31, 1996—The defendants in this defamation action have presented the court with a motion for summary judgment.

The plaintiff, John Sarandrea, brought the action in response to two articles published in *The Sharon Herald,* a daily newspaper owned and operated by the defendant, Sharon Herald Company, trading and doing business as The Herald, Ottaway Newspapers Inc. The first article, authored by co-defendant Rod Pallerino, a freelance writer, was published on December 13, 1992; the second, written by co-defendant Lynn Saternow, sports editor for the *Herald,* was published on May 30, 1993. In addition to the articles, plaintiff also contends that a poster placed on commercial newspaper racks and used to promote the December 13, 1992 article was defamatory.

The defendants maintain that the pleadings, depositions, answers to interrogatories, admissions and affidavits filed in this case fail to establish that the publications at issue are capable of a defamatory meaning. The defendants also maintain, in the alternative, that summary judgment should be granted, because the published articles are privileged under the First Amendment, as the plaintiff is a public figure or a limited public figure and the pleadings do not reveal any evidence of "actual malice."

Pa.R.C.P. 1035 provides that summary judgment

"shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Pa.R.C.P. 1035(b).

In passing upon a motion for summary judgment, it is not part of the court's function to resolve issues of fact, but solely to determine whether there *is* a genuine issue of material fact. *Ritmanich v. Jonnel Enterprises Inc.,* 219 Pa. Super. 198, 280 A.2d 570 (1971). Even an uncontradicted affidavit will not support a grant of summary judgment because of the factual issues it raises concerning the credibility of the affidavit. *Penn Center House Inc. v. Hoffman,* 520 Pa. 171, 553 A.2d 900 (1989); *Curran v. Philadelphia Newspapers Inc.,* 497 Pa. 163, 439 A.2d 652 (1981). A defendant may support a motion for summary judgment by pointing to sources in the record which indicate that the plaintiff is unable to establish a necessary element of his or her cause of action. *Eckenrod v. GAF Corp.,* 375 Pa. Super. 187, 544 A.2d 50 (1988).

In a defamation action, the plaintiff has the burden of proving the defamatory character of the communication, its publication by the defendant, its application to the plaintiff, an understanding by the reader or listener of its defamatory meaning, and an understanding by the reader or listener of an intent by the defendant that the statement referred to the plaintiff. *Smith v. Wagner,* 403 Pa. Super. 316, 588 A.2d 1308 (1991). Under Pennsylvania law, it is for the court to determine, in the first instance, whether the communication complained of is capable of a defamatory meaning. *Allen*

*Organ Co. v. Galanti Organ Builders Inc.,* 798 F. Supp. 1162 (E.D. 1992).

"[A] communication is defamatory if it tends [so] to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Wecht v. PG Publishing Co.,* 353 Pa. Super. 493, 497, 510 A.2d 769, 771 (1986), citing Restatement (Second) of Torts §559 (1977). However, statements which are merely annoying or embarrassing are not defamatory. *Id.* at 500, 510 A.2d at 773. The test of whether a particular publication is defamatory is: "the effect of the [entire] article is fairly calculated to produce, the impression it would naturally engender in the minds of the average person among whom it is intended to circulate." *Id.* at 499, 510 A.2d at 772.

An inspection of the December 13, 1992 *Herald* article in light of this standard shows that the article intended to present a balanced view of the issues presented by the transfer of two student athletes from a high school in Texas to the New Castle, Pennsylvania high school where the plaintiff coaches. If anything, the article is overbalanced in favor of the plaintiff. The article consists largely of quotes by the plaintiff regarding his side of the controversy surrounding the Texas transfers. Plaintiff does not allege that he was misquoted in the article, and neither plaintiff's complaint nor plaintiff's brief ascribes a specific defamatory meaning to the statements in the article. In fact, plaintiff's brief favorably contrasts the December 13, 1992 article with the rack card promoting it and the May 30, 1993 article written by co-defendant Saternow. Plaintiff's brief in opposition to motion for summary judgment at 44-45. Plaintiff contends that the rack card and the Saternow article are defamatory because they allege

that plaintiff engaged in "illegal recruiting" but, as plaintiff's brief concedes, "the Pallerino article does not even use the word 'recruit.'" *Id.* Therefore, we conclude that the December 13, 1992 article by defendant Rod Pallerino is not capable of a defamatory meaning.

The plaintiff does ascribe a specific defamatory meaning to the promotional poster placed on newspaper racks prior to publication of the Pallerino article. The rack card is defamatory, according to the plaintiff, because it suggests that the Texas transfer students were "recruited" in violation of high school athletics rules. Plaintiff's brief in opposition to motion for summary judgment at 31. The communication in question states:

### THE STORM OVER THE HURRICANES

New Castle Coach John Sarandrea is
stirring up controversy with 2 hot recruits
from the Lone Star State.
Read about it
Dec. 13, only in . . . *The Sunday Herald*

Whereas the December 13 article merely observes that changes to the basketball program at the New Castle high school have been accompanied by controversy, the rack card suggests that the plaintiff has played an active role in triggering or stimulating that controversy. The December 13 article also uses the neutral phrase "Texas transfers" to refer to the team's two new standout basketball players, whereas the rack card uses the more highly charged phrase, "2 hot recruits."

Obviously, the rack card does not sustain the neutral tone of reporting found in the December 13 article. Similarly, no one would mistake the May 30, 1993 piece written by sports editor Lynn Saternow for neutral reporting.

The headline to the May 30 column proclaimed:

ALLEGED LINK OF EX-PITT
AIDE SARANDREA IS NO
SURPRISE TO AREA FANS

The column went on to state that Coach Sarandrea was being investigated by the NCAA for alleged recruiting violations involving New York City star basketball player Jamal Faulkner. The violations allegedly occurred while Sarandrea was an assistant basketball coach at the University of Pittsburgh. The column continued,

"It is not too difficult to believe that Sarandrea may be involved. Last year, his New Castle team featured two players from Texas—Rick Steele and Marcus Thomas—who just happened to move to New Castle even though their families didn't. And rumors on the street already are that the brother of Pitt star Eric Mobley may be moving to New Castle this year.

"Would these be cases of blatant recruiting? You be the judge."

The column concluded by decrying the "win-at-any-cost" message sent by the school board when it "looked the other way" in the matter of two Texas transfer students, who were permitted to play basketball for the New Castle Hurricanes.

If the rack card and the Saternow column are construed as indirect statements of fact, they are clearly capable of a defamatory meaning as they imply that Coach Sarandrea recruited Rick Steele and Marcus Thomas. However, the defendants maintain that neither the rack card nor the May 30 Saternow column should be construed as making factual allegations. According

to the defendants, the communications express constitutionally protected opinions.

Expressions of opinion, unlike statements of fact, may be constitutionally protected. Under Pennsylvania law, which follows section 566 of the Restatement (Second) of Torts (1977), an expression of opinion is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion. *Braig v. Field Communications,* 310 Pa. Super. 569, 456 A.2d 1366 (1983). In order to determine whether the rack card and the Lynn Saternow piece are capable of a defamatory meaning, the court, therefore, must decide whether the communications are factual in nature or whether they constitute opinion, and if they are opinion, whether they imply the existence of undisclosed defamatory facts.

Although no bright-line test exists for differentiating opinion from fact, the court may inquire into the circumstances surrounding the controversial language. *World Boxing Council v. Cosell,* 715 F. Supp. 1259, 1261 (S.D. N.Y. 1989). In this case, we believe that it is sufficiently clear from the context that Lynn Saternow's column, which was subtitled "Sportsview," was an expression of opinion and would be understood by an ordinary reader as such.

As the court observed in *Henderson v. Times Mirror Company,* 669 F. Supp. (D.Colo. 1977), *aff'd,* 876 F.2d 108 (10th Cir. 1989), sportswriting invokes a context that is far different from ordinary news reporting.

"Certainly, the sports world is an environment where the kind of 'robust' debate endorsed by the Supreme Court in *New York Times v. Sullivan* has flourished. Even the once fastidious etiquette of Wimbledon has succumbed to the more gross and tawdry vernacular formerly more characteristic of hockey rinks and foot-

ball stadia. The world of Damon Runyon was not portrayed in the idiom of the church supper." *Id.,* 669 F. Supp. at 361. (citation omitted)

It would, in fact, be unsurprising if "smash-mouth" football did not find a counterpart in the "smart-mouth" writing style of today's sports columnists. "Trash talk" on the field instantly translates into "trash talk" off the field as well.

If the sportswriting is more typically equated with rhetorical hyperbole than with journalistic precision, this does not mean that libel is justified when it takes place in the sports pages. Under section 566 of the Restatement (Second) of Torts (1977), a statement of opinion may be actionable if it implies the allegation of undisclosed facts as the basis for the opinion. Suppose A writes to B about C, "I think he must be an alcoholic." Under the Restatement definition, the statement is actionable because it implies that A knew undisclosed facts that would justify his opinion. Restatement (Second) of Torts (1977) §566, illustration 3. Conversely, it is not defamatory if A writes to B about C:

" 'He moved in six months ago. He works downtown, and I have seen him during that time only twice, in his backyard around 5:30 seated in a deck chair with a portable radio listening to a news broadcast, and with a drink in his hand. I thing [sic] he must be an alcoholic.' The statement indicates the facts on which the expression of opinion was based and does not imply others. These facts are not defamatory and A is not liable for defamation." Restatement (Second) of Torts (1977) §566, illustration 4.

In his May 30, 1993 column, Lynn Saternow opined that the plaintiff had recruited the two Texas transfer students, Rick Steele and Marcus Thomas, so that they could play basketball for the New Castle Hurricanes.

Saternow acknowledged that the school board had found no evidence of recruiting, but maintained that "the school board obviously looked the other way." Saternow based his opinion on the fact that the NCAA was conducting an investigation of illegal recruiting at the University of Pittsburgh, where the plaintiff formerly coached. Saternow also indicated that the brother of a former Pitt star was rumored to be moving to New Castle, presumably to play on the team. Saternow's opinion, thus, implicates a pattern of behavior on the part of the plaintiff, assuming that he was involved in illegal recruiting at Pitt, assuming that the Pitt star's brother was indeed attempting to "transfer" to New Castle, and also assuming that the plaintiff was somehow involved in the move.

Lynn Saternow's opinion, in short, is partially based on disclosed facts, but also relies on other "facts" which are simply not in evidence. Saternow suggests that the outcome of the NCAA inquiry was a foregone conclusion, months before the NCAA actually issued a report. His column also implied that the plaintiff was somehow involved in attempts to recruit the Pitt star's brother to play for the Hurricanes, even though it was not clear at the time that the student was even contemplating the move. This court is reluctant to equate unsubstantiated rumor with disclosed fact. It thus finds that Saternow's expression of opinion is not of the protected type. Rather, the columnist's remarks constitute a "mixed" expression of opinion made on the basis of undisclosed facts that are defamatory in character.

This court also finds that the rack card statement was capable of a defamatory meaning. The court understands that the rack card was used to "hype" Rod Pallerino's December 13, 1992 article, but is not inclined to characterize the rack card statement as opinion for

that reason. At any rate, the rack card statement is not constitutionally protected, because it relies on undisclosed facts. Certainly, there is nothing in Rod Pallerino's article that would justify the inference that the plaintiff had recruited Rick Steele and Marcus Thomas. Defendant Pallerino's cautious, journalistic, bet-hedging use of the phrase "Texas transfers" suggests, at least, that he was not prepared to make the inferential leap from transfer student to recruited athlete. The *Herald's* promotional copywriter was not as cautious.

The defendants in this case assert that, even if statements on the rack card and in the Saternow column are capable of a defamatory meaning, the statements are nonetheless privileged, and summary judgment should be granted, because the plaintiff is a public figure for the purposes of this controversy.

One who publishes a defamatory communication concerning a public figure is subject to liability only if he knows that the statement is false and defamatory, or acts in reckless disregard of these matters. Restatement (Second) of Torts (1977) §580A. It is the function of the court to ascertain, first, whether the plaintiff is a public figure, and if so, whether the plaintiff's evidence, viewed in the light most favorable to the plaintiff, establishes a sufficient question of fact concerning the issue of actual malice so as to permit the case to proceed to trial before a jury. *Braig v. Field Communications, supra; Iafrate v. Hadesty,* 423 Pa. Super. 619, 621 A.2d 1005 (1993).

In the landmark case of *New York Times v. Sullivan,* 376 U.S. 254, 11 L.Ed.2d 83, 84 S.Ct. 719 (1964), the United States Supreme Court held that the Constitution does not permit a public official to maintain an action of defamation unless he or she can prove that the defendant had knowledge of the falsity of the

communication or acted in reckless disregard of its truth or falsity. A later Supreme Court case, *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 18 L.Ed.2d 1094, 87 S.Ct. 1975 (1967), held that the constitutional restriction also applies to "public figures."

The "public figure" concept was refined in *Gertz v. Robert Welch Inc.,* 418 U.S. 323, 41 L.Ed.2d 789, 94 S.Ct. 2997 (1974). *Gertz* distinguished between a person who achieves such pervasive fame or notoriety that he becomes a public figure for all purposes and one who voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. Also see, Comment c to section 580A of the Restatement (Second) of Torts (1977).

In determining whether plaintiff is a public figure, this court is guided by a long line of cases holding that athletes and coaches are either "all-purpose" public figures or so-called "limited-purpose" public figures. See *e.g., Curtis Publishing Co. v. Butts, supra; Barry v. Time Inc.,* 587 F. Supp. 1110 (1984); *Basarich v. Rodeghero,* 321 N.E.2d 739 (1974).

The holding in *Barry* is particularly instructive. As the *Barry* court observed, a limited public figure is an individual who is drawn up into a particular public controversy and, thus, becomes a public figure for a limited range of issues relating to that controversy. *Id.* at 1115. As the *Barry* court also noted, the public controversy requirement can only be met by a controversy which attracts the public's interest because it affects persons other than the direct participants. *Id.* In *Barry,* this requirement was met because the public controversy involved alleged recruiting violations at the University of San Francisco. As the court observed,

"The outcome of this controversy could reasonably have been expected to have a significant impact on members of the USF community as the reputation of their university was at stake . . . Moreover, although there may have been little or no dispute that violation of NCAA rules was improper, there certainly was a dispute as to what the university should *do* about allegations of recruiting violations.

"Furthermore, this controversy must be viewed in the context of the larger public debate over the proper role of athletic programs at institutions of higher learning. For many years, critics of bigtime collegiate athletics have commented on what they perceived to be the incongruity of a 'win at all costs' attitude, and the concomitant infractions of NCAA rules such an attitude engenders at educational institutions which are at the same time attempting to instill some sense of public virtue in their students . . .This court finds that the 'public controversy' requirement is met in the present case by the existence of the specific controversy of USF surrounding the NCAA investigations of the athletic department, and by the intimately related nationwide controversy over the proper role of athletics at institutions of higher learning . . ." *Id.* at 1116-17.

Debate over the proper role of athletics is not limited to institutions of higher learning. The debate ranges at the high school level as well. In the instant case, this court finds an intimate connection between that debate and controversy generated by the arrival from Texas of two transfer student-athletes. Like it or not, the plaintiff in this case was drawn into this controversy by virtue of his position, if not by his active participation. As the court observed in *Barry,* the voluntary decision to pursue a career in sports, whether as an athlete or a coach, invites attention and comment regarding one's

job performance and, thus, constitutes an assumption of the risk of negative publicity. *Id.* at 1119. One who seeks the limelight should not be surprised if it turns into a spotlight.

High school coaches are not immune to the glare of adverse publicity. As our sister court observed in *Basarich v. Rodeghero, supra,* such coaches, and their policies, "are of as much concern to the community as other 'public officials' and 'public figures.' " *Id.,* 321 N.E.2d at 742. Accordingly, this court finds that the plaintiff is a limited public figure and that the actual malice standard is applicable to this case.

Actual malice can be established either by proving that the communication was made with the knowledge that it was false or with reckless disregard of whether it was false or not. When the first alternative is relied upon, the burden falls on the plaintiff to show, not only that the statement was false, but that the defendant *knew* it was false. *Hepps v. Philadelphia Newspapers Inc.,* 506 Pa. 304, 485 A.2d 374 (1984), *rev'd on other grounds,* 475 U.S. 767, 89 L.Ed.2d 783, 106 S.Ct. 1558 (1986), *cert. denied, appeal dismissed,* 475 U.S. 1634, 90 L.Ed.2d 330, 106 S.Ct. 1784 (1986).

Moreover, because actual malice must be shown with "convincing clarity," *New York Times Co. v. Sullivan, supra,* 376 U.S. at 285-86, 11 L.Ed.2d at 686, 84 S.Ct. at 70, the plaintiff must present clear and convincing evidence that the defendant knew the defamatory statement was false or acted in reckless disregard of its truth or falsity. *Rose Corp. v. Consumers Union of United States,* 466 U.S. 485, 80 L.Ed.2d 46, 101 S.Ct. 117 (1980). As our nation's high court observed over a decade ago, the clear and convincing standard applies, not only to trials on the merits, but also to motions for summary judgment. *Anderson v. Liberty Lobby Inc.,*

477 U.S. 242, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986). As our Supreme Court instructed in *Liberty Lobby,*

"When determining if a genuine factual issue as to actual malice exists in a libel suit brought by a public figure, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under *New York Times* . . . There is no genuine issue if the evidence presented is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence." *Id.* at 254, 91 L.Ed.2d at 215.

Thus, although the existence of actual malice is a jury question, a trial judge must determine whether the evidence in the record in a defamation case is sufficient to send the issue of actual malice to a jury.

Courts have found sufficient evidence of actual malice where a newspaper published misleading headlines in oversize type which were unsupported by the facts set forth in the body of the news stories they accompanied. See *Sprouse v. Clay Communication Inc.,* 158 W.Va. 427, 211 S.E.2d 674 (1975), *cert. denied,* 423 U.S. 882, 96 S.Ct. 145, 46 L.Ed.2d 107 (1975), *reh. denied,* 423 U.S. 991, 96 S.Ct. 406, 46 L.Ed.2d 311 (1975). In *Sprouse,* the West Virginia Supreme Court held that the inconsistency between the headlines and the stories was a valid link in the chain of evidence needed to support (1) a claim of a false statement, (2) defamatory in nature, (3) known at the time of publication to be false, and (4) published with intent to injure. *Id.,* 211 S.E.2d at 683. By analogy, the inconsistency between the rack card and the December 13, 1992 news story it was intended to promote is sufficient to raise a genuine issue of fact as to whether the defendants knew the rack card falsely implied that Coach Sarandrea had recruited student-athletes or whether the defendants pro-

ceeded to publish the rack card with reckless disregard as to its implications or innuendoes. Accordingly, we find that summary judgment cannot lie with respect to this issue and that the issue should be submitted to a jury.

Plaintiff contends that the issue of actual malice with respect to co-defendant Lynn Saternow's May 30, 1993 "Sportsview" piece should be submitted to a jury as well. We agree, although not for the same reasons cited by the plaintiff.

In his complaint, plaintiff alleged that the *Sharon Herald's* publication of the May 30, 1993 article was marked by "an extreme departure from the standard of investigation and reporting ordinarily adhered to by reasonable newspapers and/or writers." Complaint at 7 and 8, paragraphs 23 and 24. In support of this allegation, plaintiff points to *Herald* editor Alan Raykie's acknowledgment that the newspaper has no written policy requiring columnists to investigate the facts and circumstances underlying their opinions. Deposition of Alan Raykie at 10. Co-defendant Lynn Saternow also acknowledged that he did not conduct a formal investigation of the facts before writing his column about the plaintiff; rather, Saternow relied on previously published articles and information provided by *New Castle News* sports editor Kayleen Cubbal, his source for the Eric Mobley rumor. Deposition of Lynn Saternow at 23, 39-40, and 63.

In support of his position that the *Sharon Herald* displayed actual malice in failing to investigate the facts before publishing the May 30, 1993 article, plaintiff relies principally upon *Curtis Publishing Co. v. Butts, supra,* and its companion case, *Associated Press v. Walker,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094

(1967). The *Butts* and *Walker* cases stand for the proposition that a newspaper's departure from accepted canons of objective reporting and investigation can be considered by a jury in determining whether there was reckless disregard of truth or falsity. However, more recent cases appear to withdraw from the *Butts-Walker* standard. Dicta in *Gertz v. Welch, supra,* indicates that mere deviation from accepted standards of journalism will not support an action for defamation brought by a public figure. In another holding, handed down one year after *Butts* and *Walker,* the U.S. Supreme Court directly confronted a newspaper's failure to investigate, and found that it was not sufficient to establish actual malice. *St. Amant v. Thompson,* 390 U.S. 727, 20 L.Ed.2d 262, 88 S.Ct. 1323 (1968). Other cases have held that a news reporter may rely on statements made by a single source, even though they reflect only one side of the story, and that actual malice may not be shown by evidence that the defendants failed to avail themselves of available means for ascertaining the falsity of allegedly defamatory statements. 50 Am.Jur.2d §38.

As these cases make clear, "failure to investigate does not in itself establish bad faith." *St. Amant v. Thompson, supra* at 733, 20 L.Ed.2d at 269. The failure of a newspaper to check the accuracy of statements may show carelessness, improvidence, or even negligence, but is constitutionally insufficient to show recklessness. See *Hepps v. Philadelphia Newspapers Inc., supra; Brophy v. Philadelphia Newspapers Inc.,* 281 Pa. Super. 588, 422 A.2d 625 (1980); *Baldine v. Sharon Herald Co.,* 280 F. Supp. 440 (1966), *aff'd,* 391 F.2d 703 (1968). The critical test of recklessness is not failure to investigate. It is whether "the defendant in fact en-

tertained serious doubts as to the truth of his publication." *St. Amant v. Thompson, supra,* 390 U.S. at 730, 20 L.Ed.2d at 267.

We believe that the record raises a genuine issue of material fact as to whether defendants entertained serious doubts about the truth of their publication. This issue was raised during co-defendant Saternow's deposition testimony by his response to plaintiff's questions about the certitude of the conclusions printed in his column:

"Q. Based on the information that you derived prior to May 30, 1993, did you have any doubt that John Sarandrea may or may not be involved in illegal activity involving the NCAA?

"A. Well, I have no doubt that he may or may not be because that's both.

"Q. Well, let's rephrase it. Did you have any doubt in your mind that he was involved in illegal activity?

"A. Certainly, I had some doubt. I had no proof yet, you know . . . ." Deposition of Lynn Saternow at 66.

Whatever it may say about his commitment to standards of journalistic integrity, Saternow's admission of "some doubt" raises an issue of material fact as to whether he entertained serious doubts about the material printed in his column. This is a matter for a jury to decide.

For the foregoing reasons, the court shall enter an order granting in part and denying in part defendants' motion for summary judgment.

## ORDER

Pursuant to the appended opinion, the court enters the following order:

(1) As to the news article written by defendant Rod Pallerino and published by defendant Sharon Herald Company on December 13, 1992 and related provisions or allegations of plaintiff's amended complaint, the defendants' motion for summary judgment is granted as to those averments of the plaintiff's amended complaint relating to the December 13, 1992 news article of Rod Pallerino, and judgment is entered for defendants Rod Pallerino and Sharon Herald Company to that extent only.

(2) As to the advertisement rack card or poster displayed publicly on or about December 13, 1992 by defendant Sharon Herald Company and related provisions of plaintiff's amended complaint, the defendants' motion for summary judgment is denied.

(3) As to the news article written by defendant Lynn Saternow and published by defendant Sharon Herald Company on May 30, 1993 and related provisions or allegations of plaintiff's amended complaint, the defendants' motion for summary judgment is denied.